Douglas B. STEPHENS and Elaine R. Stephens; Tennessee Homestead Company, a Utah Corporation, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 39–85L.

United States Claims Court.

Dec. 17, 1986.

Orval C. Harrison, Salt Lake City, Utah, with whom was Glen E. Fuller, for plaintiffs.

Gary B. Randall, Washington, D.C., for defendant; S. Reed Murdock, Office of Staff Judge Advocate, Hill Air Force Base, Utah, of counsel.

## OPINION

BRUGGINK, Judge.

This is a suit for compensation for the alleged taking of an avigation easement in the airspace over plaintiffs' property. Plaintiffs' claim is founded upon the fifth amendment to the Constitution of the United States. They allege that their property has been taken without due process of law and without just compensation. The specific basis for plaintiffs' claim is that defendant "inversely" condemned an easement across their land through persistent low overflights of jet aircraft. The court has jurisdiction pursuant to 28 U.S.C. § 1491 (1982).

Upon consideration of the evidence presented at trial, the parties' submissions, and the applicable law, and after an inspection of the premises,[1] the court concludes for the reasons stated herein that plaintiffs are not entitled to recover.

## I. FACTUAL BACKGROUND

a. *The Property*

Plaintiffs' land lies between Salt Lake City and Ogden, Utah, in the Weber River

1. At the request of both parties, the court was    flown and driven over plaintiffs' land.

Valley. Plaintiffs own a total of 572 acres consisting of two contiguous parcels. Tract 1 contains approximately 386 acres, while Tract 2, which lies to the east, consists of 186 acres. The north property line of both tracts roughly follows a ridgeline marking the southern extent of residential development in plaintiffs' immediate vicinity. During the years between approximately 1940 and the present, the communities of South Ogden and Washington Terrace have substantially developed the plateau between the Weber Valley and the foothills of the Wasatch mountains to the northeast. Plaintiffs' land lies south of this plateau. The property drops off slightly at first, then steeply, until it reaches the right of way of the Union Pacific Railroad. Just beyond the railroad is the Weber River. Sharing the bottom of the valley with the river at that point is Interstate 84. There is approximately a 150 foot drop between the high point of plaintiffs' land along the northern border, and the low point along the southern border.

Plaintiffs at one time owned much of the land in Washington Terrace contiguous and to the north of their property. This land has been sold over the years in parcels for residential and other suburban development.

Plaintiffs Stephens acquired the land in question through a series of purchases between 1940 and 1960. The Stephens jointly own Tract 1. An undivided half interest in Tract 2 was transferred to Douglas B. Stephens, a first cousin, and was ultimately acquired by plaintiff Tennessee Homestead Company. Although this interest was subsequently transferred to another company, at the time of the alleged taking, 1982, the three plaintiffs were the record owners.

A portion of Tract 1 lies within the City of Washington Terrace and is zoned R–2. This permits single and duplex family dwelling. The remainder of Tract 1 is zoned A–1, A–2 (agricultural), and S–1–G (suburban sand and gravel). All of Tract 2 is zoned A–1.

The property has been put to a number of uses. Over the past 40 years Mr. Ste-

phens has developed a substantial and widely regarded cattle operation. He has experimented with new cattle strains and with innovations in pasturing. Plaintiffs have also conducted a gravel operation on the property. Over several years gravel has been stripped down to an approximate depth of fifteen feet on large portions of the property. Some of the stripped areas have been reclaimed into pasture land, some have not; some are currently being stripped. In a portion of the area in which a large amount of stripping took place, there was at one time an asphalt plant which recycled the sand left over from earlier gravel excavations. Although the plant has been dismantled, evidences of it remain on the northern terrace of Tract 1.

There are two residences. One is that of the plaintiffs Stephens; the other is used by a hired hand. In addition, there are a small office for the ranch operation and some farm buildings.

b. *Hill Air Force Base*

Hill Air Force Base (HAFB) is a permanent military installation operated by the Air Force. The land for the base was acquired and construction began in the 1930's. On December 1, 1939, the site was named "Hill Field." In 1948 the installation was given its current name. It encompasses over 6,600 acres.

The first runways were completed at HAFB in 1941. However, with the advent of jet aircraft the need for a new and longer runway arose. The new runway was completed in 1956 and measures 13,500 feet long with 1,000 foot overruns at each end. Presently, it is the sole runway at HAFB; other shorter runways were closed in 1961. The runway is designated as "runway 32" when traffic proceeds in a northwesterly direction, and as "runway 14" when operations are in a southeasterly direction. Prevailing winds dictate which runway is used. Runway 14 is used for between 95 and 97 percent of the flight operations at HAFB, while runway 32 is used for the remainder of the operations.

Although the base's particular functions have been modified from time to time, its primary mission since inception has been logistical support, storage, and aircraft and missile maintenance. A number of different flying units have been assigned to HAFB. One of these is charged with responsibility for the Utah Test and Training Range facility, across the Great Salt Lake from HAFB.

Numerous types of aircraft have operated at the base. By the mid 1950's jet aircraft were in wide use. The 1950's and 60's saw the B–57, F–80, F–84, F–86 and F–89, among others. The F–105 arrived at HAFB in 1973. Approximately 54 F–4's were stationed there between 1975 and 1980. During the period 1978–1980, the 388th Tactical Fighter Wing was assigned the F–16 aircraft. The first F–16 arrived at HAFB on November 15, 1978, and flying operations began on January 11, 1979. By May 1981, the wing had an inventory of 103 F–16's. During 1983, the 419th Tactical Wing was activated and assigned 20 F–16's.

Aircraft operations at HAFB fluctuated between 32,730 and 59,954 operations for the years 1970–79, with a large portion of the operations up to 1975 consisting of helicopter flights. Since 1980, the total operations count has increased over 40 percent. However, during 1986, the 388 Tactical Fighter Wing lost approximately 25 percent of its F–16 aircraft with the deactivation of one squadron. This will reduce operations by approximately 25 percent.

HAFB lies opposite the Weber River from plaintiffs' property and the plateau occupied by Washington Terrace. It is at approximately the same altitude as plaintiffs' land. At its closest point the property is approximately a mile to a mile and a half from the northwest end of the runway.

It is undisputed that military aircraft have been overflying plaintiffs' property since the inception of HAFB. It is also undisputed that the volume of those overflights has increased substantially since the mid–1970's. By far the greatest volume of overflight is by the F–16, although other aircraft such as the F–4 and F–105 also make overflights. It is the F–16 which is of most concern to the plaintiffs since overflights by other aircraft did not commence within the six-year period of the statute of limitations, and thus any "taking" by them would be uncompensable.

### c. *The Flight Tracks*

Maps and flight track descriptions show that planes approaching HAFB for landing typically fly in a counter-clockwise racetrack or oval pattern. The planes approach the runway in a southeasterly direction without flying over plaintiffs' land, overfly the runway on a straightleg, then execute a left-hand semi-circle, then another straightleg which at one point crosses plaintiffs' land, then just north of plaintiffs' land execute another left-hand semicircle leading to their final approach. The planes are descending during the entire northwest-direction straightleg, but the major portion of the descent is in the last half of the final turn northwest of plaintiffs' land.

Typically, the overflights consist of echelon formations of two to eight planes. As the aircraft fly over the runway on the first leg of the racetrack and approach the first left-hand turn, they break off at about five second intervals, so that the total time between planes on landing is at least ten seconds. Once a plane is on the ground, minimum down time is one and a half hours.

The racetrack pattern is used for landings, low approaches to runway 14 with a re-entry into a landing, and less frequently for a simulated "flame out." For each take-off and landing, the testimony was that there were an average of one and a half overflights of plaintiffs' property. This pattern has been and will continue to be used because it is the most convenient way to land a number of planes in quick succession. The use of this left-hand racetrack is not unique to HAFB. It is typical for Air Force bases and follows a recommended counter-clockwise pattern.

The testimony and exhibits show that the precise track followed by a given plane varies either way slightly in an east-west direction. However, the court is satisfied that the three most eastern and northern orange dotted lines shown on plaintiffs' exhibit 1, a large aerial photograph which has an overlay of dotted orange lines showing five hypothetical flight paths, are an accurate depiction of F–16 flight tracks with respect to the plaintiffs' land. These patterns result in overflight primarily of Tract 2, but also of the eastern end of Tract 1.

There is some confusion in the record as to whether the F–16 pattern typically results in planes reentering the airspace over the northwest corner of plaintiffs' property. Whatever confusion exists, however, is probably due to the pre-marking of plaintiffs' exhibit 1. The two interior-most of the five hypothetical paths, if correct, would result in the final turn being executed in large measure over plaintiffs' land. However, there was absolutely no testimonial or documentary support for these two paths. Mr. Stephens was asked by his counsel whether "these lines that we have marked on Exhibit 1 [are] follow[ed] precisely by these planes as they fly over your property?" The substance of Stephens' answer was that the dotted lines did not necessarily track the actual flight paths.

More importantly, Major John Thurman, Chief, 338th Fighter Wing Current Operations, testified with respect to the two inside dotted oranges—the only lines which show planes reentering the airspace over plaintiffs' land—"I do not believe that a pilot in a normal overhead pattern can fly that pattern." (Tr. at 722). This is confirmed by plaintiffs' exhibits 25 and 26 and by defendant's exhibit 53. They show, for 1979 and 1983, flight tracks for jet aircraft at HAFB. The tracks are superimposed on a map of the area which also shows the location of the property. It is clear that none of those tracks call for reentry into the airspace over plaintiffs' land. There was ample testimony that those tracks closely approximate the actual flight pat-

terns. In sum, although a few planes no doubt stray over the northwest corner of plaintiffs' land, the court concludes that the typical pattern would be somewhat beyond that corner, and that the two interior-most dotted lines on plaintiffs' exhibit 1 do not represent actual flight tracks.

When planes flying the southeast to northwest leg of the pattern leave the airspace over plaintiffs' land and start making their second left-hand turn, they overfly the populated areas of Washington Terrace. Since the greatest amount of elevation decrease is in the last half of the final turn, and since the populated areas are at a higher elevation than virtually all of the property, the court concludes that the elevation of the flight pattern is lower in these populated areas than over plaintiffs' land, and that the southern portions of Washington Terrace are affected as much or more by F–16 overflights as plaintiffs' land.

The evidence also tends to show that this racetrack pattern has been the same for many years. There was testimony and evidence, and the court concludes, that although the typical pattern created by F–105 and, to a greater extent, F–4 jets, was somewhat further east than the F–16 pattern, it still resulted in planes continuously overflying the eastern end of plaintiffs' land.

The court concludes, therefore, that plaintiffs have established overflights of both Tracts 1 and 2—albeit in a different configuration than plaintiffs assert.

d. *Frequency*

A great deal of evidence was adduced at trial which relates to the frequency of flights over the property. It is less than clear what precise conclusions can be drawn from it, however. It is uncontested that in 1982, the year of the alleged taking, there were 73,384 "operations" recorded at HAFB. Over 35,000 of those were by F–16's. An operation consists of either a takeoff, or an overflight of the runway, or a landing. There was also testimony that

for each non-instrument landing by an F–16, there would be at least one and sometimes two overflights of plaintiffs' property. There was also testimony that there were 20,835 "sorties" flown by F–16's stationed at HAFB. One sortie is counted for each mission, which includes departure, movements over the runway, and landing. Eighty-five percent of the sorties overfly plaintiffs' property. Assuming flights evenly spaced over every day of the year, and based on an average of one and a half overflights per sortie, a figure of 73 overflights per day is produced. This and other evidence, while not entirely uniform, persuades the court that there are in the range of 70 to 100 F–16 flights over plaintiffs' property per day and a substantially smaller number of overflights by other aircraft.

### e. *Elevation of the Overflights*

Plaintiffs made little attempt to establish the altitude of the overflights. The only testimony proffered was that of Mr. Stephens. He stated that the overflights ranged in elevation from 800 to 1,500 feet. When questioned on cross-examination as to his method of making this determination, Mr. Stephens replied:

A   Well, my barn's 40 feet wide and your plane's [F–16] 46 feet wide, I stepped out and took a photo 1200 feet away, took the size of the barn and took the size of the airplane and Mr. Fuller [plaintiffs' counsel] has it in his briefcase. It's a pretty good bet.

Q   Was it the same size as the airplane?

A   Just about.

(Tr. 221.) When questioned further, Stephens affirmed written prepared testimony that "most of the planes crossing the area crossed between 1000 and 1,500 [feet]." (Tr. 226.)

In their post-trial brief plaintiffs also attempt to argue from plaintiffs' exhibit 43. This document came in without objection and without substantive discussion at the close of plaintiffs' case. It purports to show "Flight Track Elevation above Ground Level" for five locations at the northwest corner of plaintiffs' property. It is a potentially important exhibit because it suggests that flight track elevations at those five points are all in the 800–900 feet range. In their brief, plaintiffs explain that it is drawn from three other exhibits (plaintiffs' exhibits 1 &; 2, defendant's exhibit 16), but neither the exhibit nor the discussion in the brief explain who made the necessary calculations.

There are a number of serious flaws in the compilation. It is clear from an examination of the locations on the map attached to plaintiffs' exhibit 43 and by its incorporation of plaintiffs' exhibit 1, that plaintiffs are relying on the two interior sets of dotted lines appearing on that latter exhibit as reflective of actual flight tracks. The accuracy of the exhibit therefore hinges on the validity of the assumption that the last left turn in the regular F–16 flight track is normally executed over the northwest corner of plaintiffs' property. As explained previously, however, there is no evidence to support use of those lines as actual flight tracks. In fact, the evidence was entirely to the contrary.

Of equal concern to the court is the absence of any expert testimony to verify either the theory upon which the exhibit was based, or the actual calculations made. This is critical because it results from a meshing of three totally independent exhibits—a topographic map which does not indicate precisely plaintiffs' land (plaintiffs' exhibit 2), an aerial photograph which does not show elevations (plaintiffs' exhibit 1), and an official flight track description which has no actual geographic reference points other than the runway (defendant's exhibit 16).[2] Given the precision called for

---

**2.** Plaintiffs' exhibit 43 assumes use of a two and a half degree glide slope in approaching the runway. This is said to be taken from defendant's exhibit 16, p. 3. The court is unable to make that determination from defendant's ex-

hibit. If anything, defendant's exhibit 16 significantly undermines plaintiffs' argument. It shows that upon entering the final turn, planes are at 2070 feet above ground level ("AGL"). The evidence, as discussed above, shows that

by the factual and legal questions before the court, the significant potential for error in joining disparate exhibits, and the total lack of explanatory testimony, the court concludes that plaintiffs' exhibit 43 is entitled to no weight.

By contrast, defendant offered the expert testimony and supporting documentation of Dwight Bishop, who is trained in engineering and physics, to establish the altitude of the overflights. Bishop testified that his company photographed 246 aircraft over a four day period at four different locations on plaintiffs' property. Virtually all the planes observed were F–16's, although measurements were also taken of T–33's, T–38's and F–4's. The vast majority of the pictures, 219, were taken at a point where the flights would be closest to the northwestern boundary of the property, as the pilots prepare for their final approach for landing. From the pictures, Bishop determined the elevations of the planes. This was accomplished by measuring the size of the plane in the photo and comparing it to the actual length of the plane. This resulted in a figure representing the *distance* from the observer on the ground to the aircraft. Unless the plane was directly overhead—which would normally not be the case with respect to photos taken at the northwest corner—actual elevation would be less.

Bishop explained that the ground observer took pictures only of planes which were no more than 20–30 degrees from being directly overhead in order to minimize distortion. Only six of the 246 overflights photographed were at a distance of less than 1,000 feet and only one of those six was an F–16. The average distance of the overflights at the northwest corner of the property was 1,830 feet. He testified that for planes which were not overhead, the potential difference between distance and actual altitude would be from six to thirteen and a half percent. In addition Bishop admitted that if the fuselage of the plane

was tilted significantly, its length might appear smaller in the photograph and thus make the distance appear greater than it actually was. If that occurred, he testified the maximum error would be five percent. These calculations were not contested by the plaintiffs.

Even assuming that the maximum amount of error were introduced into every single photo, the actual elevations would be as follows:

—the range of elevations would be from 571 to 2845 feet
—the average elevation at position 1: 1491 feet
—the average elevation at position 2: 2070 feet
—the average elevation at position 3: 2225 feet
—the average elevation at position 4: 2421 feet.

Bishop's figures are consistent with the testimony of pilots that the standard flight track used for landing at HAFB, regardless of the type of aircraft involved, calls for an elevation of 2,000 feet above ground level. Pilots acknowledged during their testimony that there is some degree of variation in this elevation, but the court is persuaded that the vast majority of flights occur over plaintiffs' property at an altitude of between 1000 and 2500 feet.

## II. DISCUSSION

### a. *Applicable Law*

The law on the taking of avigation easements by the Government over private lands has proceeded from the Supreme Court's landmark decision in *United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). In *Causby*, the Court stated that, apart from the "immediate reaches above the land," the airspace is a public highway and part of the public domain. It noted the common law doctrine that ownership of land extended to the periphery of the universe, but found that

this is approximately the point planes leave the airspace above plaintiffs' land. Although the exhibit shows an AGL of 727 feet 6000 feet from

the runway, the court has elsewhere found that the flight track between the 2070 AGL and 727 AGL points does not go over plaintiffs' land.

the doctrine had no place in a modern world. Congress had recognized this by stating that the United States has "complete and exclusive national sovereignty in the airspace." *Id.* at 260–61, 66 S.Ct. at 1065–66, *quoting* Air Commerce Act of 1926, 44 Stat. 568, 572, *repealed by* Federal Aviation Act of 1958, 72 Stat. 731, 806 (current version at 49 U.S.C. 1508(a) (1982)). Further, any citizen has a right of freedom of transit through "the navigable air space." *Id.* at 260, 66 S.Ct. at 1065, *quoting* Civil Aeronautics Act of 1938, 52 Stat. 973, 980, *repealed by* Federal Aviation Act of 1958, 72 Stat. 731, 806 (current version at 49 U.S.C. 1304 (1982)).

Nevertheless, the court recognized a potentially competing interest of the landowner: "if the landowner is to have full enjoyment of the land, he must have exclusive control of the immediate reaches of the enveloping atmosphere." *Id.* at 264, 66 S.Ct. at 1067. The Court resolved these interests by establishing the rule that, although some degree of inconvenience must be tolerated by the subjacent landowner, flights by government-owned aircraft over private land can constitute a taking if they are "so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land." *Id.* at 266, 66 S.Ct. at 1068.

The court noted that while a landowner may not physically occupy the stratum of airspace above the land, he does occupy it in the sense that continuous invasions of that space affect his ability to use the surface itself. *Id.* at 265, 66 S.Ct. at 1067. Consequently, the majority in *Causby* concluded that the landowner, as an incident to ownership, can maintain an action under the fifth amendment for invasion of airspace.

This cause of action has developed a substantial pedigree over the past forty years, particularly in the Court of Claims and in this court. *See, e.g., Speir v. United States,* 202 Ct.Cl. 1020, 1024, 485 F.2d 643, 646 (1973); *A.J. Hodges Industries, Inc. v. United States,* 174 Ct.Cl. 259, 262, 355 F.2d 592, 594 (1966); *Mid-States Fats and Oils Corp. v. United States,* 159 Ct.Cl. 301, 309 (1962); *Davis v. United States,* 155 Ct.Cl. 418, 420, 295 F.2d 931 (1961). These and other cases make it clear that the invasion must be in airspace directly over the complainants' land. *See Mock v. United States,* 164 Ct.Cl. 473, 475 (1964); *Batten v. United States,* 306 F.2d 580 (10th Cir. 1962).

*Causby* specifically reserved the determination of the precise limits of the airspace within the public domain. 328 U.S. at 266, 66 S.Ct. at 1068. The Court found a taking, however, when it was shown that the typical glide path for approaching planes in that case was at an altitude of less than 100 feet. In reaching its conclusion, the Court pointed to 49 U.S.C. § 180 (repealed 1958) (current version at 49 U.S.C. 1301(29) (1982)), wherein Congress placed in the public domain "airspace above the minimum safe altitudes of flight prescribed by the Civil Aeronautics Authority." Those minimum safe altitudes were fixed by regulation to be 500 feet in daytime and 1000 feet at night.

The present version of that regulation, 14 C.F.R. § 91.79 (1986), provides that in other than "congested" areas, the minimum safe altitude for other than takeoffs and landings is 500 feet. From these regulations, cases following *Causby* have concluded that flights above 500 feet in non-congested areas are in the public domain, or in navigable space.[3] *Griggs v. Alleghe-*

---

**3.** In their post-trial brief, plaintiffs also point to 14 C.F.R. § 91.87(d) (1986), "Operation at airports with operating control towers":

(d) *Minimum altitudes.* When operating to an airport with an operating control tower, each pilot of—(1) A turbine-powered airplane or a large airplane shall, unless otherwise required by the applicable distance from cloud criteria, enter the airport traffic area at

an altitude of at least 1,500 feet above the surface of the airport and maintain at least 1,500 feet within the airport traffic area, including the traffic pattern, until further descent is required for a safe landing....

The court has not been directed to and has been unable to find any case law applying this regulation in the context of an avigation lawsuit. The court concludes that this provision is not appli-

*ny Co.,* 369 U.S. 84, 87, 82 S.Ct. 531, 532, 7 L.Ed.2d 585 (1962); *Adams v. United States,* 230 Ct.Cl. 628, 680 F.2d 746 (1982); *Lacey v. United States,* 219 Ct.Cl. 551, 595 F.2d 614 (1979); *Avery v. United States,* 165 Ct.Cl. 357, 362, 330 F.2d 640 (1964); *Matson v. United States,* 145 Ct.Cl. 225, 229, 171 F.Supp. 283 (1959); *Powell v. United States,* 1 Cl.Ct. 669 (1983); *Hero Lands Co. v. United States,* 1 Cl.Ct. 102, 554 F.Supp. 1262 (1983). In congested areas, the navigable airspace begins at 1000 feet.[4] *Aaron v. United States,* 160 Ct.Cl. 295, 300, 311 F.2d 798 (1963).

■ With one exception, which will be treated separately, the present state of the law therefore requires that if plaintiffs' land is "congested," they must establish:

1. flights directly above their land; and

2. the overflights are of such a frequency that,

3. their use and enjoyment of the land is substantially interfered with; and

4. that the flights are below navigable airspace (1000 feet); and

5. that this taking took place within six years of filing the complaint.

In reviewing the factual background in this case, the court found that aircraft directly overfly plaintiffs' land in great numbers. The first two elements of a taking under *Causby* are thus present: overflight and frequency.[5] The element of altitude, however, is missing. Having found that the overflights occur at over 1000 feet, it is unnecessary for the court to determine whether the navigable airspace over plaintiffs' land begins at 500 feet or 1000 feet. Whether or not plaintiffs' land is "congested" within the regulatory meaning,[6] defendant's overflights are in a zone which this court has held to be navigable airspace.

Plaintiffs therefore must rely on some exception to the general rule. They find it in *Branning v. United States,* 228 Ct.Cl. 240, 654 F.2d 88 (1981). That case involved a training program conducted at the Marine Corps Air Station in Beaufort, South Carolina ("Beaufort Air Station"). Part of

---

cable to a determination of *property* rights. It purports to be a safety regulation, not a disclaimer of national sovereignty. The reason courts have looked to companion regulation 14 C.F.R. § 91.79 (1986) is that the Federal Aviation Act specifically incorporates safe takeoff and landing altitudes in defining "navigable airspace." 49 U.S.C. § 1301 (29) (1982).

4. The Supreme Court recently recognized the continuing vitality of this concept in a decision involving police surveillance from 1000 feet— "within navigable airspace." *California v. Ciraolo,* —— U.S. ——, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986).

5. This is a minimal showing. Frequency and substantiality of impact are separate concepts but obviously inter-dependent.

6. The regulations do not define "congested areas," nor does the case law provide any distinction between congested and non-congested areas. Nor are the parties' arguments on this issue sufficiently focused. Defendant points to the character of plaintiffs' land in isolation. There is no question that the property is uncongested in that sense. There are only two houses on all 572 acres, and plaintiffs' current use of the land would be compatible with a totally rural setting.

Plaintiffs' argument points to the character of the surrounding metropolitan area. There is no question that the Salt Lake City/Ogden area is a significant metropolis, and that the area immediately abutting plaintiffs' land on the north is fully utilized from a commercial standpoint.

The court concludes that neither approach is entirely satisfactory. First, if carried to its logical end, defendant's argument would sustain a conclusion that a vacant lot in Manhattan is "uncongested." Moreover, there would be a potential inequity inherent in finding that plaintiffs' land is uncongested, and therefore it can be overflown theoretically at 501 feet, if plaintiffs could prove that the reason the land is uncongested is the overflights. Similarly, focusing exclusively on the macro environment of the Salt Lake City metropolitan area, as plaintiffs would urge, is too gross a measure. It would preclude the possibility of low altitude air corridors through urban areas.

In the court's view, it is more appropriate to take into account the character of the area immediately adjacent to plaintiffs' land. Abutting and in some instances surrounding plaintiffs' northern border is a heavily developed residential area of single and multiple family housing. That portion of plaintiffs' land which is currently susceptible of residential development absent overflights is most similar in character to the adjoining residential plateau and would therefore be in a "congested" area.

the program consisted of an operation referred to as "field mirror landing practice," in which the prescribed landing pattern required trainees to take off from a runway on the station and then fly directly over the plaintiff's property in a racetrack pattern at an altitude of 600 feet above ground level, and then return to the runway. The pattern was repeated continuously by each aircraft during training days.

In holding that the Government had taken an avigation easement over the plaintiff's property, the court stated:

> A vital factor of this case is that defendant devised an exercise to prepare trainees for future landings on aircraft carriers, in which heavy jet aircraft followed one another almost nose to tail in an unvarying loop over plaintiff's land. Trainees were required to hold their planes, preparatory for landing over the supposititious carrier deck, with noses up and tails down, with near maximum power (and noise) associated with low speed.
>
> Defendant could have performed this exercise elsewhere ... Thus, plaintiff was consciously singled out or selected to bear a burden which defendant also consciously elected not to impose on others....

228 Ct.Cl. at 242, 654 F.2d at 90.

The court recognized the novelty of its decision, and specifically limited its holding to the facts of the case.

Plaintiffs argue strenuously that the exception set out in *Branning* applies here. A comparison does in fact suggest a number of areas in which the circumstances here are the same as, or more aggravated than those in *Branning:*

1. the use of a racetrack pattern;
2. close flight intervals (here they are closer);
3. year round flights (more flying days here);
4. high volume of overflights.

An examination of the record persuades the court, however, that the number of dissimilarities (in the direction of less impact) is so great that the *Branning* test is not applicable.

In *Branning* the training mission consisted of "landings and takeoffs designed to simulate aircraft takeoffs and landings." 228 Ct.Cl. at 244, 654 F.2d at 91. During the weeks that the exercise was conducted, up to six F–4 fighters flew in non-stop loops over the property at issue until the planes needed refueling. The aircraft flew at 25–30 second intervals "almost continuously throughout the morning, afternoon, and sometimes at night." 228 Ct.Cl. at 244 n. 3, 654 F.2d at 92. A number of important distinctions become immediately apparent. In the case at bar, the evidence showed that most training flights involved a flight to, and landing at the Utah Test and Training Range, across the Great Salt Lake from HAFB. Although the F–16's overfly plaintiffs' property at the conclusion of that mission, they typically do so as a prelude to a routine landing. Defendant's pilots testified that although touch-and-go exercises were sometimes conducted this only resulted in one additional pass over plaintiffs' property. The routine flight to and from the test range does not leave enough fuel for more overflights. A very crucial difference then is that, unlike the situation here, the training in *Branning* was virtually exclusively centered on the plaintiff's land and called for continuous overflight. The noise in that case was a constant phenomenon during training weeks.

In addition, while the F–4 power settings in *Branning* were near maximum, the evidence here was that the F–16's seldom use full power. Also, here the F–16's do not fly after official sundown. In *Branning*, there were night flights.

The F–4 is heavier and its two engines together develop more thrust than the single engine F–16, with the result that the F–4 is a considerably noisier airplane than the F–16. The environmental impact statement done prior to the beddown of the F–16's at HAFB concluded that

> the level of operational activity of the F–16 could be increased to more than

double the current F-4 activity and still have less noise impact than the F-4 mission.

Even though more F-16's are stationed at HAFB than F-4's were stationed at the Beaufort Air Station, the court finds that the differences in overflight duration, flight pattern, plane size, engine thrust and power setting, as well as the substantial difference in average elevation, all clearly show a far greater noise impact from the activity in *Branning* than is shown here.

In addition, in *Branning*, the court found that the plaintiff's land was "consciously singled out or selected to bear a burden which defendant also consciously elected not to impose on others." *Id.* at 242, 654 F.2d at 90. The evidence there was that the Marine Corps considered the possibility of terminating training flights over plaintiff's land and moving them to a nearby field. The idea was rejected, however, because it would create an equivalent noise problem in the new location. "Thus it was decided that plaintiff landowner should bear the burden of aircraft noise." *Id.* at 251, 654 F.2d at 96.

The environmental impact statement considered prior to stationing the F-16's at HAFB also reflects a similar mental exercise:

> Bedding down the F-16 at another air base as discussed in Section IV, "Alternatives to the Proposed Action," would present a more significant environmental issue for residents of areas surrounding alternative sites.

In that sense, the area around HAFB was consciously burdened, as opposed to owners of land adjacent to air fields in other places around the country. There is a major distinction, however. In *Branning*, the plaintiff singly bore the burden of subsidizing the defendant's flight training. A review of the maps and the aerial photographs in evidence here, however, demonstrates that dozens, if not hundreds of different parcels of land are burdened. Plaintiffs' exhibit 1 shows that in Washington Terrace alone, dozens of other parcels are overflown. By choosing HAFB as opposed to another site, defendant in effect burdened (and to a certain extent benefited) a substantial part of the Washington Terrace/South Weber area. There is no evidence that *plaintiffs'* land was singled out.

Nor is there any suggestion that alternative flight patterns were available at HAFB. Rather, the testimony and documentary evidence showed that the left-hand racetrack pattern for landing is standard at all air fields. Consequently, the degree of selective burdening present here is less than that in *Branning*.

A number of circumstances thus distinguish this case from *Branning*. However, while the Court of Claims limited its holding to the narrow facts of that case, those facts plainly cannot form the only template for assessing cases involving overflight in navigable airspace. Moreover, in affirming the trial judge's decision, the court noted that "whether use of [navigable airspace] for noisy air navigation of a more conventional variety can be held as a taking is an issue that can be and is reserved for the case that presents it." *Id.* at 242, 654 F.2d at 90.

Although the decision does not suggest what circumstances are required for a taking from higher elevations, this court is not without guidance. First, the general lesson this court draws from *Branning* is that if the circumstances are sufficiently aggravated, a taking from navigable airspace may be established. Moreover, the holding in *Branning* was presaged by the Court of Claims in *Aaron* 160 Ct.Cl. 295, 311 F.2d 798. There, the court recognized that whether the flight is in navigable airspace, or ten feet below it, is of virtually no significance to the landowner. The inconvenience experienced will be substantially the same. *Id.* at 300, 311 F.2d 798. Nevertheless, the court went on to say that a boundary must be "definitely fixed":

> Acts that are permissible within the limits of the right-of-way are forbidden beyond its limits, and vice versa. Congress has fixed 500 feet as the lower limit of navigable airspace; hence, what may be permissible above 500 feet is

forbidden below it, unless compensation is paid therefor.

*Id.* at 300–01, 311 F.2d 798.

The court in *Aaron* did suggest one exception, however:

> This is not to say that a case could not arise where the unavoidable damage to a person's property occasioned by travel in the navigable airspace would be *so severe as to amount to a practical destruction or substantial impairment of it.*

*Id.* at 301, 311 F.2d 798 (emphasis added). In such a circumstance, there would clearly be a constitutional difficulty with the applicable regulations unless some right of compensation were allowed.

■ The court concludes that, in light of precedent, and upon consideration of the competing interests involved, plaintiffs should be able to demonstrate that even if flights are in navigable airspace, a taking has occurred. The court finds that the most appropriate rule is that when overflights occur in navigable airspace, a presumption of non-taking exists which can be overcome by proof of destruction of, or substantial impairment to the property. As the height of overflights increases, however, the Government's interest in maintaining air sovereignty becomes weightier while the landowner's interest diminishes, so that the damage showing required increases in a continuum toward showing absolute destruction of all uses of the property.

Although not argued in precisely these terms, plaintiffs' remaining evidence as to the effect of the overflights will be examined to determine if, in light of the other indicia of a taking, they have met this test.

*Physical Effects*

There was virtually no evidence of physical effects resulting from the overflights. Mr. Stephens testified that when planes were overhead, his workers sometimes had difficulty conversing, that windows rattled and that sometimes telephone conversations were interrupted. The suggestion that F–16's sprayed fuel on the property was countered by testimony from defendant's witnesses that the plane is incapable of releasing fuel as a free liquid. There was no evidence that the land was impaired for its current primary use as a cattle operation.

*Noise Levels*

There is not any serious dispute, and in any event the court finds, that flight activities associated with HAFB create significantly higher levels of noise on plaintiffs' land than would be present absent those activities.[7] The court also finds that most of that noise impact is from planes which fly over plaintiffs' property at some point. It becomes more difficult, however, to quantify that noise and evaluate its effect on the ground.

Sound pressure, expressed in decibels (dB), is the fundamental measuring unit for noise. The noise level goes up as the decibel level increases, but in a logarithmic rather than a linear fashion. Thus, if two sounds of 70 dB intensity are combined, the resulting dB level is 73, not 140; adding a 60 dB sound to a 70 dB sound adds only a one half dB to the sound pressure. In turn, a number of standardized methods exist for evaluating the impact of noise, using dB as the common unit of measurement. Three are of primary importance to this case. They are the "A weighted level" expressed as dB A,[8] the day-night average noise level, expressed in Ldn,[9] and data

---

7. Some of the activity has been present for more than six years. While recognizing that the F–16 is a less noisy airplane than the F–4, in considering the total noise impact the court has not made an effort to compare noise levels present before and after the arrival of the F–16's. In view of the ultimate conclusion that no substantial impact is shown within the limitations period, such a comparison is not necessary.

8. "A" weighting is a method of giving additional weight to sounds within that part of the noise frequency spectrum which is most easily heard by humans.

9. This is a method of bringing to bear in one measuring system dB A level, duration, and variation in noise over a 24 hour period, with a 10 dB penalty for nighttime noise.

from a single sound event, expressed as LAX.

Noise contour maps have been developed for HAFB as well as for other Air Force flight facilities. These maps were created as part of the Air Installation Compatible Use Zone ("AICUZ") program for military air installations. The AICUZ system was initiated at HAFB in 1974, and maps for the years 1974, 1977, 1982, and 1983 were introduced. These maps show noise contour lines surrounding the runway. There are five contour lines, ranging in five dB increments from a high of 85 dB at the runway and diminishing to 65 dB. Areas outside the contour lines are all below 65 dB. The bands created between these lines are termed compatible use districts ("CUD's"). Each CUD is described in terms of its compatibility with development in the surrounding community.

In addition to reflecting noise levels emanating from the runway, the AICUZ maps show which areas in the proximity of the runway are in a high accident potential zone (APZ).[10] These two elements of noise and accident potential are then spread out over 13 CUD's, the least impacted being CUD 13.

Defendant's exhibit 26 is the AICUZ map for 1983. It also shows the boundaries of plaintiffs' land. Approximately half of plaintiffs' land—roughly the western part of the southern portion of the property—is within CUD 13, which encompasses land subject to 65–70 dB.[11] The northeast half of plaintiffs' property, which is the most susceptible of residential development, is largely beyond CUD 13, the minimum level.

The AICUZ reports accompanying the maps state the following with respect to CUD 13: "[a]lthough it is recognized that local conditions may require residential uses in these CUD's, this use is ... dis-

couraged in CUD's 11 and 13." The reports are advisory only however, and the determination to build is ultimately left to the local jurisdiction. One impact of the reports, other than possible voluntary adoption, is through the residential loan setting policies of Department of Housing and Urban Development ("HUD"). Before providing mortgage insurance for residential housing loans, HUD requires certain noise attenuation measures, such as additional insulation, to be taken when houses are built in the 60–70 dB zone in order to reduce interior noise levels by five or ten dB. 24 C.F.R. § 51.104 (1986). The attenuation obviously does not lower the dB level outside the home. Although it attempts to discourage construction in those areas, the evidence showed that HUD has insured loans in CUD 13 zones, and that loans are apparently being insured in areas around HAFB which are affected by noise to the same degree as plaintiffs' property.

In addition to the AICUZ maps, both parties rely on noise studies done on the property by expert witnesses. Richard Fullmer was plaintiffs' witness. He placed listening devices on the property and measured sound levels at five locations over approximately six weeks. His findings are expressed in terms of $L_{dn}$ averages for each location on a daily basis, and in terms of the LAX levels based on two different minimum thresholds of noise. In addition, Fullmer showed a correlation between periods of high noise levels and high volume of operation at HAFB.

One of the attachments to Fullmer's testimony is a map showing plaintiffs' property, the noise measuring locations, the average $L_{dn}$ at those spots, and an overlay of a CUD–13 noise contour line shown on the 1983 AICUZ report. The three measuring

---

**10.** Despite some evidence that there have been 18–25 crashes of F–16's stationed at HAFB, the court concludes that this factor is not a contributing element to any taking. There was no evidence of crashes during landing or take-off at HAFB, much less on plaintiffs' land. Also, plaintiffs' property is not within an APZ.

**11.** The 1977, 1982, and 1983 maps show virtually identical noise impact on plaintiffs' property. The 1974 map shows considerably less area within CUD 13. There is a question, however, as to the reliability of the assumptions built into the 1977 report. This would only raise a problem in the event the statute of limitations were an issue. It is not.

points beyond CUD–13 measured readings of 63.4, 63.7 and 58.0 Ldn. Location four, well within CUD–13, measured 67.0 Ldn. Location two, at the edge of the CUD–13 contour line, measured an average of 68.2 Ldn. Fullmer's evaluation thus validates to a degree the 1983 AICUZ map insofar as plaintiffs' land is concerned.

Fullmer's data with respect to LAX measurements, unlike Ldn measures, has not been expressed in terms of effect on residential compatibility. Without any meaningful comparison or conclusions offered, the court gives the LAX data no weight.

Defendant's expert witness on noise levels was Dwight Bishop. Bishop also did a series of noise measurements on plaintiffs' property. Although Bishop's study came to a number of conclusions,[12] on the primary one—actual noise measurements on the ground—there was very close agreement with Fullmer's calculations. Bishop's range of 64.5 dB to 66.4 dB approximates Fullmer's range of 58 dB to 68.9 dB.

The court finds that the AICUZ maps and the sound studies show elevated noise levels. A separate question arises, however, with respect to how those noise levels contribute to a potential taking of the property. Here the parties' two respective experts are in sharp discord.

Plaintiffs' expert witness on the physiological and psychological effects of noise was Dr. Karl Kryter. His counterpart was Dr. Sanford Fidell. In summary, Dr. Kryter testified that continuous exposure to the noise levels which he understood to occur on the property would be damaging both psychologically and physiologically. He did not perform any tests on the property or evaluate the effect on plaintiffs Stephens. His conclusions resulted from an application of a posited 60–70 Ldn noise level in view of studies conducted elsewhere.

Defendant offered the testimony of Dr. Sanford Fidell. Part of Dr. Fidell's testimony was a written report examining Dr. Kryter's report in some detail. In it, he questions the validity or applicability of the studies relied on by Dr. Kryter. Dr. Kryter also prepared a written defense of his study. Both men testified at trial. After considering the evidence and testimony, the court finds that while much of Dr. Kryter's report is seriously diminished in import, nevertheless, it does support the conclusion that sustained levels of noise in the range of 65–70 Ldn can be statistically linked to elevated levels of annoyance, emotional distress, and mental and bodily disorders.

In the abstract, however, that finding does not advance the plaintiffs' case. In the first instance, the evidence shows that the portion of the property most susceptible of residential construction corresponds to an area of the lowest noise impact. Moreover, as Dr. Kryter testified, his report is an attempt to predict what would happen if the land were commercially developed. The court would make two observations. First, there was no evidence, other than that already discussed, linking the projected physiological and psychological effects of sound directly to the plaintiffs. Second, the plaintiffs must demonstrate that *their* use of the property is taken. The fact that some future inhabitants of the land might be affected is of no import unless the plaintiffs can show that that phenomenon has the present effect of "taking" the property within the meaning of the *Aaron/Branning* decisions.

Dr. Kryter attempted to make this link in his conclusion that noise levels in the 60–70 Ldn range would make plaintiffs' property incompatible with residential development. The court finds that implausible. First, it is inconsistent with plaintiffs' own expert on real estate values, John Brown, who testified that the property *is currently*

---

**12.** The study concludes, for example, that a large amount of the noise on plaintiffs' land originates with flight activities at HAFB other than direct overflights, and that there are significant noise sources other than HAFB, such as the railroad and highway alongside the proper-

ty. The court concludes, however, that due to the evidence showing the volume of F–16 over-flights as a proportion of total operations, the plaintiffs are entitled to rely on the net noise levels on their property—except insofar as a question of a second taking is concerned.

suitable for low to middle income residential development. Second, Dr. Kryter's area of expertise is acoustics, not real estate; at best he can simply point to the economic studies upon which he bases his report. Third, the studies relied on involve other cities and other countries, not plaintiffs' property. Fourth, Bishop's report shows that nearly 28 million people in America are exposed to Ldn levels of more than 65, and 63.6 million people are exposed to Ldn levels of over 60. Finally, the documentary evidence and HUD regulations referred to earlier all show that levels between 60 and 70 Ldn are at least marginally compatible with residential development, although sound attenuation should be used. The court finds that the acoustics evidence does not demonstrate a substantial impact on plaintiffs' property.

*The Real Estate Appraisals*

Plaintiffs contend that the highest and best use of their land, but for the overflights, is currently residential housing, specifically, single-family residences and multi-unit dwellings of above-average quality utilizing associated features such as a golf course and riding trails. In view of the overflights, however, the alleged present and future use for the properties is for "rural ranchettes." These were described by plaintiffs' appraiser, John Brown, as "containing a modest home and several acres of land where there can be kept a few horses and possibly some other livestock." Narrative Testimony of John C. Brown, plaintiffs' exhibit 42, at 21 (hereafter, "Brown report"). The total parcel was projected at from four to ten acres, inhabited by a family with "several children and its income would be below average." *Id.* Utilizing the land in this fashion would mean, according to Brown, that it was worth only slightly more than half as much as the land without overflights. He calculated damages[13] in the range of $2.7 million.

Defendant's expert witness on the before and after values of plaintiffs' land was David Van Drimmelen. His conclusion was that the property has not been adversely affected by the overflights; that the before and after highest and best uses are the same—residential housing of the same quality. In addition, defendant put on testimony, over plaintiffs' objection, to show that the lower half of the property was too unstable to be suitable for residential development or for use as a golf course.

Brown's first major assertion is that the highest and best use of the upper portion of plaintiffs' land is for *above-average quality* residences. The court finds that Brown's analysis is not supportable. Considering his concession that the property even now can be used for ranchette-type residences, and the importance under *Aaron/Banning* of showing degree of impact, this first assertion is crucial.

The court finds that Brown's analysis is not supportable. The following is typical of Brown's depth of analysis:

> Specifically, the bulk of the subject properties lying above 4600 feet elevation furnish ideal building sites for residential construction.... Because of the southern exposure of all of the properties, the terraced portion contained within the West tract (1) lends itself admirably to the construction of a golf course facility where the warm, sunny exposure during the early spring and late fall months furnishes that area with the advantage of at least one month over other golf course sites in the general area. The adjacent lower area located to the east of the terraced area can be adapted to hiking trails, horse stables and facilities, and the like.
>
> The utilization of the terraced area lying below 4600 feet elevation would support both high-quality and single-family residences around portions of a golf

---

13. Trial of the action was bifurcated. The portion tried related to liability. The precise quantum of damages was deferred in the event the court found liability. The court permitted appraisal testimony and evidence of suitability for development as highly relevant to plaintiffs' claim that the highest and best use of the land has been taken, and on the substantiality of the alleged diminution.

course and multi-family garden-type condominium or apartment units in other adjacent selected locations. The total combination of features and amenities provides all of the attributes of high-quality living: view, recreational facilities, proximity to schools and churches, and easy and convenient access to other community and employment sources. In short, it is my opinion that the subject properties during the time frame heretofore mentioned and the immediate foreseeable future—except for overflights of F–16 aircraft—were and would be one of the prime residential-development properties in the State of Utah.

Brown report at 11–12. Although Brown is entitled as an appraiser to draw such general conclusions, they are without specific support. There was testimony that the areas immediately adjacent to plaintiffs' land were all varying degrees of middle class housing, as confirmed by the court's tour of those neighborhoods. None of Brown's testimony demonstrated why plaintiffs' land should be peculiarly of *above average* quality or inhabited by "high-income people." Brown report at 20.

The only factor which might warrant Brown's optimism is the suggestion that the lower portion of plaintiffs' land could be used as a golf course. The golf course, however, is one of the most puzzling aspects of his report. Brown's reasoning appears to be as follows:

1. the lower portion of plaintiffs' property is unsuited for residential development but is suited for a golf course;

2. a golf course is not viable without adjoining residential development;

3. higher priced housing depends on the presence of a golf course;

4. therefore, the highest and best use of plaintiffs' land is for higher priced housing, i.e., as a development for "higher income" people.

Even without considering the question of the physical viability of a golf course, the logic of Brown's construct is destroyed in his answer to the following question:

Q. .... Without the golf course, and without the overflight of F–16 aircraft, in your judgment what would the highest and best use of this area be?

A. It would remain as a—as a high quality residential subdivision.

This is blatantly inconsistent with the third supposition above that suitability as "high quality," "above average," "high income," "high caliber" housing is based on the presence of the golf course. Brown report at 20. If, as he testified, the golf course is not necessary for that sort of use, it follows that his report is in error, and his explanation for why plaintiffs' land is uniquely suited to be a high income development is flawed. The *degree* of effect on plaintiffs' land of the overflights is therefore minimized.

Brown's second major conclusion is that except for a "limited fringe area" [14] in the northeast corner of plaintiffs' property, the property is relegated to an inferior use. This most crucial of Brown's conclusions has virtually no support. The bulk of the 10 pages of the report which is devoted to this question is taken up with a description of flight paths, the character of the F–16, a history of HAFB, and some observations about the past and future uses of the base. The court gives no weight to any of these statements since they admittedly were not based on personal knowledge. Brown's entire report and his testimony are shot through with sweeping assertions made without support and in regard to areas about which he is obviously not an expert. Some were validated by other evidence, some are unsupported anywhere else, and a number are directly contradicted. For example, Brown made the crucial assertion in his report (p. 18) that

**14.** Brown did not take this area into consideration in the "before and after" comparison of Stephens' land. Presumably, defendant would be entitled to some credit for this "fringe." Instead, all the residential portions of the land area treated at "ranchette" value. Moreover, this concession seems to be inconsistent with his testimony that the noise impact "splashes off" plaintiffs' property.

the present and future use of the subject properties for medium-to-above average quality residential use has been destroyed. This conclusion is even more evident when one examines the pattern of flight "movements" at Hill Air Force Base—increasing greatly over recent years. There is no evidence indicating a reduction in aircraft "movements"; rather, the probabilities are that the number of "movements" above the subject will increase as time goes on.

The latter assertion is plainly contrary to the facts. One quarter of the 388th TFW was deactivated effective July 1, 1986, with the net result a projected one quarter decrease in F–16 sorties.

Other sweeping conclusions are equally tenuous. On page 13 of his report, he stated that, "[m]y observations and those of Mr. Stephens indicate that the F–16 is generally more objectionable." When asked to justify that important proffer of evidence, he stated, "Well we had a—we made a—I recall the conversation, we were in his office, and we made a statement, I don't know who made it first, that the F–16s were a noisy and rather obnoxious airplane, and we seemed to agree." (Tr. at 472.) There is no reason to think Brown could distinguish one type of plane from another. Reliable evidence demonstrated that in fact the F–16 is less noisy. Brown also made the observation in his report that flights occur during "nighttime hours." The evidence showed the contrary.

Brown presumed to speak at length on the effect of the direction of engine thrust and its contribution to noise levels on the property. (Tr. 476–480.) This analysis was important to his views about the effect of noise on plaintiffs' property as opposed to areas to the east and north. He begins,

It appears to be falling from where it leaves these—as it crosses the subject property. There may be an increase and then it falls off and it becomes a—it comes in for a landing. Now, the thrust that is utilized in making the turn before the glide path starts, this seems to be the time that the noise is most vibrant over

the—and the most vicious over the subject property.

Q. And at that point in time, you indicated that the aircraft is in a descent?

A. Well, as it makes a—the leg around to make a landing.

Q. And what direction is its thrust directive at that point?

. . . .

A. Generally, the thrust is in a southerly direction over the subject property. . . . . Then it comes into the landing, this is on a high arc landing. Now on a low trajectory approach, then as you cross the . . . Stephens' home, the thrust is all on the subject property on a low trajectory landing, and this thrust continues on the subject property as you come through the . . . upper lefthand corner of the subject property and then continues as the aircraft makes a turn to the south, the thrust is almost directed all to the subject property and then it makes its landing. And you also have another low altitude approach which is even more directly associated with the subject property . . . and this is an extremely noisy direct approach onto the Hill Air Force Base.

. . . .

Well, there's noise all around it from these—these aircraft but the thrust of the problem is the low altitude approaches to Hill Air Force Base which are directly associated with the Stephens tract.

Q. I just want a general idea of how you would characterize the noise caused, for example, by one of these aircraft turning here and pointing its exhaust [toward Pleasant Valley]? How do you characterize that as compared to, say, the plaintiffs' property? Are you in a position to make that judgment?

A. I am not an expert. All I can do is give you [what] a layman would observe and if you needed an expert to testify then you'd have to hire an expert to so testify.

(Tr. 476–480.) Brown's last comment is the most salient. While Brown's report and

testimony can be easily segregated into supportable and unsupportable factual predicates because of competent evidence from other sources, this dialogue demonstrates the witness's willingness to speculate with abandon on matters beyond his knowledge. It also shows that his conclusions are based on the false premise that the interior-most dotted lines on plaintiffs' exhibit 1 were in fact accurate depictions of flight paths. Moreover, given the facts that the planes are descending, that plaintiffs' land slopes toward the oncoming planes, and that the planes are not turning over plaintiffs' land, the direction of their thrust cannot possibly be toward the property.

While Brown is qualified as an appraiser to give the court the benefit of his expertise on land valuation matters, his methodology for drawing conclusions even in that area was flawed. His conclusion that the most natural development of the properties "would constitute an economic risk no developer would seriously entertain," (Tr. 566) was not based on any study. Nor was his assertion that the post-taking use of the property would be by a family with "several children" and a "below average" income.

Brown attempted to draw a parallel between most of the upper portion of plaintiffs' property and "Ridgeline III," a small new development immediately adjacent to the northwest corner of plaintiffs' land. Brown concluded: this development was blighted; it was subject to noise comparable to plaintiffs' property; and therefore plaintiffs' land is similarly affected. He formed his first conclusion from a drive through the neighborhood and the observation of 3 "for sale" signs on the approximately 12 existing houses, and on the "for sale" signs on virtually all the empty lots. He concluded that the houses "haven't been able to sell," and that "the blight is the fact that ... the noise is ... causing some—some consternation of the owners." (Tr. 447.) He came to this conclusion despite: 1. not having talked to the owners; 2. not having talked to the relevant realtors; 3. not having talked to the developer; 4. not having counted the empty houses; 5.

the fact that a single lot (less than a quarter acre) sold in July 1985 for $20,000.00; and 6. the fact that four new houses were under construction.

Other troublesome aspects of Brown's testimony and report abound. Brown made the statement that a substantial landslide which occurred on plaintiffs' property in 1981 did not have any effect on the value of the land, and did not need to be included in the appraisal. His justification for that conclusion is inherently implausible. (Tr. 517–19.)

Brown admitted the importance of easements to land value, yet a major easement for power lines was not discussed in the report, despite the fact that in their present state, the power lines would "certainly complicate development as a high-cost residential area." (Tr. 532.) Brown even agreed that with "these lines there, ... there's no way that you could develop that into a high cost residential area with that kind of view." (Tr. 534.) Although he said a knowledgeable developer "would consolidate those power lines," his consideration of the feasibility of such a consolidation was summed up with, "this consolidation conversation has been going on for several years." (Tr. 535.) Regardless of whether the lines could be consolidated consistent with high income development, Brown's failure to mention this significant variable in his report is either disingenuous or sloppy. In any case it weakens his credibility.

One of the several other indications that Brown's conclusions are less than meets the eye involves the important issue of comparing land sales before and after the alleged taking. His defense of the "Market Value Considerations" portion of his report creates the distinct impression Brown has performed, as he writes, a "comparable sales" analysis. The reality of this analysis is less impressive. When asked to produce his "grid" comparing sales, he was less specific. It developed that the comparison consists of listing on a single sheet the names of the owner and the terms of sale. He used five "before"

sales and only two "after" sales. No analysis was done of this data. He simply formed a judgment by "eyeballing." Of even more concern to the court is that the two comparable "after" sales were parcels directly off the opposite end of the runway. They are both subject to recorded easements owned by the Air Force *which permit overflight at 300 feet* or above. In addition, the easements preclude *any* residential development. Brown admitted that that fact would "affect the validity" of his conclusions as to before and after values. Clearly, reliance on these two comparables is utterly inappropriate, given the testimony that the "after" use of plaintiffs' land is still residential.

Moreover, Brown testified on numerous occasions about the "splash over" or "feathering out" of the noise impact into areas around plaintiffs' property. One of the "before value" comparable sales, however, took place in 1985, long after the alleged taking. This sale, to Wyndruff Construction Company, was in an area immediately adjacent to plaintiffs' land and was for $40,000.00 per acre, an amount four times as high as the "after" value he placed on plaintiffs' land.

Brown's explanation of the statement in his report (p. 20) that "studies have shown that high-income people are less tolerant of noise" reveals the porousness of his conclusion:

Q. I assume you mean studies that have been conducted by scientists or someone?
A. No. These are studies that—investigations that I have made.

(Tr. 565.) Without belaboring the issue, the testimony showed that no "studies" of any kind were done. The court also finds Brown to have been less than direct in answering questions. *See, e.g.,* Tr. 517–18; 507; 533. All the factors cited above persuade the court that Brown's conclusions

as to the highest and best use of the land, and hence the degree of alleged taking, are not credible,[15] and plaintiffs have therefore not established a substantial impact on the value of their land.

### III. CONCLUSION

The court finds that the evidence does not support a conclusion that the noise levels present on the property, the character of the overflights, or the before and after appraisals demonstrate a substantial impairment, much less a "practical destruction."[16] The court concludes that plaintiffs have not demonstrated an entitlement to compensation for a taking.

The Clerk is ordered to dismiss the complaint. Each side to bear its own costs.

---

15. Although not analyzed here as unnecessary to the result, the court finds Van Drimmelen's testimony to be credible. While recognizing that his analysis had defects, on the whole it was substantially more methodical and supportable than Brown's testimony. The court also finds Van Drimmelen to be personally credible. His testimony and report lend strong support to a finding that plaintiffs have not shown a reduction in the highest and best use of the land.

16. Given this holding, the court need not address defendant's argument concerning the statute of limitations.