Alva A. AARON et al.

v.

The UNITED STATES.

Peter ANDERSEN et al.

v.

The UNITED STATES.

Nos. 113–59, 489–58.

United States Court of Claims.

Jan. 11, 1963.

Irl Davis Brett, Pasadena, Cal., for plaintiffs.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen., Ramsey Clark, for defendant.

WHITAKER, Judge.

These two cases, in which plaintiffs are seeking to recover for the taking of easements of flight for defendant's jet aircraft over their respective properties, are before us on the findings of fact and recommendations for conclusions of law of Trial Commissioner Mastin G. White, supported by an opinion, which are hereinafter set forth.

The Trial Commissioner's opinion in this case was written before the Supreme Court's opinion in Griggs v. Allegheny County, 369 U.S. 84, 82 S.Ct. 531, 7 L. Ed.2d 585. Prior thereto this court and the Supreme Court had held that the United States was liable, under certain circumstances, for the taking of an easement of flight over property by its planes in landing and taking off from an airport. Following those decisions, the Trial Commissioner concluded that the United States had not taken an easement of flight over certain parcels of land owned by some of the plaintiffs in this case prior to the time Air Force pilots first began flying jet planes over the properties with the intention of continuing to do so at will. When Air Force pilots did begin flying over their property, he said there was a taking by the United States. That date he fixed as about August 1, 1953.

However, in Griggs v. Allegheny County, supra, the Supreme Court, for the first time, held that the operator of an airport was liable, under certain circumstances, for the taking of an easement of flight over property necessary for the use of airplanes in landing and taking off from its airport. This holding makes it necessary for us to re-examine the date of the taking, because the United States began the joint operation of this airport much before the Air Force pilots began flying planes over it. Prior thereto, and while the United States was jointly operating the airport, the planes had been flown by the pilots of the aircraft manufacturing companies.

As the Trial Commissioner found, and as he says in his opinion, on February 26, 1952, the United States took over joint operation of the airport with Los Angeles County, preliminary to its later complete acquisition of it on February 2, 1954. Pursuant to contracts entered into with the Air Force, aircraft manufacturing companies established and maintained at the airport plants for the manufacture of jet aircraft, and, beginning in February 1952, their pilots

began making test flights of the planes being manufactured for the United States over some of the parcels of land involved in this case.

When the United States took over joint operation of the airport, it did so for the primary purpose of providing a place for the landing and taking off of the jet planes being manufactured for it on the airport grounds. It knew, of course, that these planes would fly over some of plaintiffs' properties, and it intended that they should do so at whatever altitude take-offs and landings required. It turned out that the planes passed over the porperties of some of the plaintiffs at altitudes of less than 500 feet, the lower reach of navigable air space over noncongested areas. This continued unabated from February 1952 to October 1956, when the number of these flights sharply decreased, but still continued thereafter to a greater or lesser extent.

When the flights commenced and it was ascertained that the planes passed over the properties at altitudes lower than the navigable air space, and defendant nevertheless continued the flights, it thereby manifested an intention to continue these trespasses on the air space below the navigable air space, which belonged to plaintiffs. But plaintiffs had no use for this air space, except as it contributed to their use and enjoyment of the surface of the ground, and except as it insured against an impairment of their use and enjoyment of the surface of the ground. So long as these flights did not seriously interfere with the use and enjoyment of their properties, the defendant did not impose a servitude upon them for which plaintiffs are entitled to compensation. In our opinion this did not occur until August 1953 for the reasons now to be stated.

From the time the defendant took over joint operation of the airport in February 1952 until January of the following year, there was an average of 61 flights per month by jet aircraft. Beginning in January 1953 they increased to 132, and further increased to 352 by December of that year. Prior to August 1953 the flights were by pilots of the airplane companies who were manufacturing planes for defendant. Beginning in August 1953, Air Force pilots also flew the jet planes in and out of the airport, and from this time on the number of flights substantially increased. In 1954, they ranged from 296 to 675 per month; in 1955, from 523 to 721; and in 1956, from 489 to 1001.

The use and enjoyment of their properties by plaintiffs during 1952 could not have been substantially interfered with, since there was an average of only two flights a day over their properties. In January 1953, they increased to something over four a day, and by the end of the year they had increased to ten or twelve a day. We think that some time during 1953 there was substantial interference with plaintiffs' use and enjoyment of their properties. The Trial Commissioner fixed August 1953 as the date of the taking, because at that time Air Force pilots began making test flights. We do not think this is determinative, but the record does not show substantial interference before that date, but it does show it thereafter. Hence, we see no reason to depart from the date fixed by the Trial Commissioner. Plaintiffs' counsel in oral argument accepted that date as the one on which the statute of limitations began to run.

That was about 18 months after the defendant began joint operation of the airport, and after the flights had increased from something over two a day to about a dozen a day. Although later the flights greatly increased in number, by that time it seems to have been apparent that these flights were to continue for an indefinite time and in increasing volume, as the three manufacturing companies with plants on the airport grounds brought out more and more planes. With the advent of the Air Force pilots, plaintiffs then knew their use of their properties had been and would

continue to be seriously impaired by the flights of these planes. Before that time they were uncertain just how serious the impairment would be or how long it would continue. Before that time we do not think the statute of limitations had begun to run and, hence, plaintiffs' petitions are in time. Cf. United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789.

■ The Trial Commissioner has held that the owners of property over which planes flew at an elevation of less than 500 feet were entitled to compensation, but that they were not entitled to compensation for flights at 500 feet and above, although they may have been inconvenienced to some extent by these flights. Under the facts of this case, we think the Trial Commissioner's holding was correct. The Air Commerce Act of 1926, 44 Stat. 568, 49 U.S.C. § 171, as amended by the Civil Aeronautics Act of 1938, 52 Stat. 973, 49 U.S.C. § 401 et seq., gave the United States "complete and exclusive national sovereignty in the air space" and granted to any citizen "a public right of freedom of transit in air commerce through the navigable air space of the United States." "Navigable air space" is defined as "air space above the minimum safe altitude of flight prescribed by [the Civil Aeronautics Authority]." This Authority fixed these flights at 1,000 feet over congested areas and 500 feet over other areas. Hence, flights above 500 feet over noncongested areas are in the navigable air space in which there is "a public right of freedom of transit." The public has a right to travel in this air space with the same freedom and the same immunity as it has to travel the public highways or navigable waters. Any incidental injury done to adjacent property that is "unavoidably attendant" upon use of any highway, whether on land, or water, or in the air, is noncompensable. Matson v. United States, 171 F.Supp. 283, 145 Ct.Cl. 225; Richards v. Washington Terminal Co., 233 U.S. 546, 555, 34 S.Ct. 654, 58 L.Ed. 1088; Campbell v. United States, 266 U.S. 368, 45 S.Ct. 115, 69 L.Ed. 328.

It is true that the inconvenience and annoyance experienced from the passage of a plane at 501 feet above a person's property is hardly distinguishable from that experienced from the passage of a plane at, say, 490 feet, but the extent of a right-of-way, whether on the ground or on water or in the air, has to be definitely fixed. Acts that are permissible within the limits of the right-of-way are forbidden beyond its limits, and vice versa. Congress has fixed 500 feet as the lower limit of navigable air space; hence, what may be permissible above 500 feet is forbidden below it, unless compensation is paid therefor.

This is not to say that a case could not arise where the unavoidable damage to a person's property occasioned by travel in the navigable air space would be so severe as to amount to a practical destruction or a substantial impairment of it. When such a case arises we would then have to consider whether the relevant statutes and regulations violated the property owners' constitutional rights; but plaintiffs have not made out such a case.

■ Plaintiffs' contention in this case is that their properties were in a congested area, where the lower limits of the navigable air space is 1,000 feet. This is plainly untenable. The airport was located in the Mojave Desert. It was so located to get away from the congested areas. Many of the people living in the vicinity of the airport were attracted there by the airport itself, or by the manufacturing plants making planes for the United States. Quite a number of the residents had chicken ranches. Many of the plaintiffs in this case raised chickens on their lands. It was a sparsely settled community. The Trial Commissioner was right in holding that in this locality the air space above 500 feet was in the public domain for the type of aircraft in use at that time.

We agree with the Trial Commissioner that only those property owners in the southwest approach zone to the southwest-northeast runway, whom he names,

are entitled to recover, and that the other plaintiffs are not entitled to recover.

■ This leaves the question of the measure of damages. In a case of this sort that measure is the difference in the value of plaintiffs' properties before the taking by the United States in August 1953 and their value after the full extent of the impairment of plaintiffs' use and enjoyment of them became apparent. United States v. Dickinson, supra. This was some time between August 1953 and October 1956, when the use of this runway was largely discontinued in favor of the east-west runway.

■ While since October 1956 this runway was used only occasionally, it seems apparent that defendant intends to use it at will for an indefinite period. We, therefore, agree with the Trial Commissioner that the defendant has taken a permanent easement of flight over the property of the named plaintiffs at altitudes of 400 feet and above.

The following plaintiffs in the Aaron case are entitled to recover:

> Jack W. Clippinger and Irene Clippinger (9), Joseph B. Coburn and Sarah L. Coburn (10), Sidney S. Cogburn and Bertha M. Cogburn (11), Clifford E. Dahl and Wanda L. Dahl (12), Ralph L. Fogg and Helen M. Fogg (15), Albert L. McGuire and Carmella R. McGuire (24), Raymond W. Morrett and Betty N. Morrett (26), John F. Morris, Jr., and Minnie Morris (27), and Clayton E. Smith and Delia A. Smith (33).

None of the plaintiffs in the Andersen case, and none of the plaintiffs in the Aaron case, except those named above, are entitled to recover and the petition as to them is dismissed.

The case is remanded to the Trial Commissioner to take proof on the amount of just compensation to which the above plaintiffs are entitled determined, in accordance with this opinion.

JONES, Chief Judge, and DAVIS, DURFEE, and LARAMORE, Judges, concur.