Andrew BIDDLE, Jeanette Biddle, Todd Fakes, Rosalyn Fakes, Tammy Gardner, William Gardner, Brenda Jay, Jeffrey Jay, Khousar Kheiri, Arif Kheiri, Bryan Meyer, Judith Meyer, Raymond Shannon, Sherry Shannon, Cathy Smiley, and Robert Smiley, Appellants–Plaintiffs,

v.

BAA INDIANAPOLIS, LLC and Indianapolis Airport Authority, Appellees–Defendants.

No. 32A05–0409–CV–505.

Court of Appeals of Indiana.

June 30, 2005.

Rehearing Denied Oct. 7, 2005.

Stephen K. Huffer, Huffer & Weathers, P.C., Indianapolis, for Appellants.

Nelson Nettles, Richard Norris, Norris Choplin & Schroeder, LLP, Indianapolis, for Appellee BAA Indianapolis, LLC.

Edward W. Harris, III, Scott R. Alexander, Sommer Barnard Attorneys, PC, Indianapolis, for Appellee Indianapolis Airport Authority.

## OPINION

SULLIVAN, J.

Todd and Rosalyn Fakes, Brenda and Jeffrey Jay, Khousar and Arif Kheiri, and Raymond and Sherry Shannon (collectively "the Homeowners")[1] appeal from the trial court's grant of summary judgment in favor of BAA Indianapolis, LLC ("BAA"),[2]

---

1. Originally there were many more plaintiffs in this case. However, many have been dismissed from the proceeding as it progressed through the judicial system. In fact, several parties were dismissed by stipulation during the pending of this appeal, including Andrew and Jeanette Biddle, Tammy and William Gardner, Bryan and Judith Meyer, and Cathy and Robert Smiley, leaving only the above named parties as active appellants.

2. BAA is the operator of the Indianapolis International Airport.

and Indianapolis Airport Authority ("IAA"). The Homeowners present three issues for our review, which we restate as:

I. Whether a compensable taking of property may occur when a neighborhood is affected by noise from overflights of aircraft;

II. Whether a homeowner who purchases a residence while knowing that the prior owner has been compensated for a noise disturbance may maintain a cause of action for additional noise disturbances; and

III. Whether a cause of action based upon promissory estoppel exists.

We affirm in part, reverse in part, and remand.

IAA, which owns the Indianapolis International Airport ("Airport"), is a municipal corporation created by the City of Indianapolis. In the 1970s, IAA began preparing for the expansion of the runways and terminal at the Airport. At that time, both passenger and cargo aircraft were arriving and departing from the Airport twenty-four hours a day. In 1975, a Master Plan discussing the short and long range development plans of the Airport, including new construction, was completed. The 1975 Master Plan, which called for the construction of two new runways, one of which was to be 2,500 feet to the northwest of existing Runway 4L–22R, was given to the local media and all relevant information was made available to the public. In 1988, IAA initiated another study of the needs of the Airport to update the Master Plan. In 1990, the Master Plan Update and Airport Layout Plans were completed. The IAA Board approved the update and authorized the submission of the plan to the Federal Aviation Administration ("FAA"). The 1990 Master Plan Update discussed the need for repair or replacement of Runway 4L–22R. The IAA decided to construct a new runway, Runway 23 Right ("23R"), in a location nearly identical to one of the locations proposed in the 1975 Master Plan. Notice was provided to the public about the future development plans, and a series of public meetings were held. In 1992, the FAA approved the construction of 23R.

Construction of 23R began in 1994 and was completed on October 1, 1995. At that time, BAA, which is a limited liability company created on September 7, 1995, took over operations at the Airport pursuant to an agreement with IAA. On January 4, 1996, 23R opened for flights departing and arriving at the Airport.

Construction of the first home in Hawthorne Ridge, the development in which the Homeowners live, was completed in January 1987.[3] Since 23R opened in 1996, Hawthorne Ridge has been subject to overflights from the aircraft using 23R and has been exposed to noise. Aircraft that are landing on 23R are approximately 1,300 to 1,500 feet above the ground when they pass over or near Hawthorne Ridge. Aircraft that are departing the airport using 23R are at altitudes of 2,000 to 4,800 feet when they pass over or near Hawthorne Ridge.

A group of residents of Hawthorne Ridge sent a Tort Claim Notice to IAA and BAA on December 5, 2001. On December 6, 2001, they filed their complaint against IAA and BAA. Between December 27, 2001 and March 2002, additional plaintiffs filed their Tort Claim Notice. On August 15, 2002, the plaintiffs moved for leave to file an amended complaint, which was granted. The amended complaint listed several grounds for recovery: inverse condemnation, access to public records,

---

3. Hawthorne Ridge is approximately three miles from Airport property.

nuisance, negligence, promissory estoppel, intentional misrepresentation, and fraud.

Both IAA and BAA filed motions for summary judgment on all counts against all plaintiffs. The trial court entered findings of fact and conclusions of law on May 11, 2004. It held that no issues of material fact existed upon the claims of inverse condemnation, violation of the Access to Public Records Law, nuisance, negligence, fraud, or intentional misrepresentation as to all plaintiffs. With respect to the Homeowners and a few other individuals who have been dismissed from this appeal, the trial court also denied their claim for promissory estoppel. However, it was not until August 30, 2004 that the trial court made a final judgment upon the summary judgment motion with respect to the Homeowners so that they could file the instant appeal. See Ind. Trial Rule 56(C) (stating that summary judgment with respect to less than all the parties shall be interlocutory unless the court in writing expressly determines that there is no just reason for delay and directs entry of judgment as to less than all the parties).

We apply the same standard as the trial court upon review of a trial court's decision to grant summary judgment, i.e. whether there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Old Romney Dev. Co. v. Tippecanoe County*, 817 N.E.2d 1282, 1285 (Ind.Ct.App.2004). The party opposing summary judgment must respond to the motion by designating specific facts establishing a genuine issue for trial when the moving party has sustained its initial burden of proving prima facie the absence of a genuine issue of material fact. *Id.* We consider only those portions of the pleadings, depositions, and any other matters specifically designated to the trial court by the parties for purpose of the motion for summary judgment. Ind. Trial Rule 56(C), (H). Doubts as to the existence of a material issue of fact or inferences to be drawn from the facts must be resolved in favor of the non-moving party. *Old Romney Dev. Co.*, 817 N.E.2d at 1285. Even though the non-movant bears the burden of demonstrating that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that the non-movant was not improperly denied his or her day in court. *Id.* Because specific findings and conclusions are not required, we are not limited to reviewing the trial court's reasons for granting summary judgment although they offer valuable insight into the trial court's rationale for the judgment and facilitate our review. *Id.*

I

*Takings by Aircraft Flights*

Whether overflights by aircraft may result in a taking of private property such that the landowner is entitled to compensation is an issue which has been addressed by several federal courts but has yet to be decided by an Indiana court. In *United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), the United States Supreme Court set the stage for takings claims based upon the effects of noise from aircraft activities. There, Army and Navy aircraft made frequent low altitude flights over Causby's property. The property owned by Causby contained a house and various outbuildings used for raising chickens. The end of the neighboring airport's runway was 2,220 feet from a barn and 2,275 feet from the house. The path of glide to the runway passed directly over the property, and the safe glide angle passed over the property at 83 feet, which is 67 feet above the house, 63 feet above the barn, and 18 feet above the highest tree. The runway was used about four percent of the time for

takeoff and seven percent of the time for landing by bombers, transports, and fighters. The planes would pass so close to the property that leaves would blow off trees, and the glare from the planes would light up the place at night. The noise was so startling and loud that each day as many as six to ten chickens would fly into the walls from fright, killing themselves. Production from the chickens also fell and Causby had to discontinue the use of the property as a commercial chicken farm. The family was deprived of their sleep and was frightened by the possibility of an accident.[4]

The United States argued that since the flights occurred within the minimum safe altitude of flights which had been prescribed, they were an exercise of the right to travel through the airspace. *Id.* at 260, 66 S.Ct. 1062. It asserted that without a physical invasion of the property of the landowner, no taking of property had occurred. *Id.*

The Supreme Court noted the "ancient doctrine that at common law ownership of the land extended to the periphery of the universe." *Id.* However, it declared that the doctrine has no place in the modern world because Congress has declared the air to be a public highway. *Id.* at 261, 66 S.Ct. 1062. Nonetheless, the Court noted that a taking could exist, as conceded by the federal government, if the flights rendered the property uninhabitable. *Id.* In its analysis, the Court stated:

"It is the owner's loss, not the taker's gain, which is the measure of the value of the property taken. *United States v. Miller,* 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55. Market value fairly determined is the normal measure of the recovery. *Id.* And that value may reflect the use to which the land could readily be converted, as well as the existing use. *United States v. Powelson,* 319 U.S. 266, 275, 63 S.Ct. 1047, 1053, 87 L.Ed. 1390, and cases cited. If, by reason of the frequency and altitude of the flights, respondents could not use this land for any purpose, their loss would be complete. It would be as complete as if the United States had entered upon the surface of the land and taken exclusive possession of it.

We agree that in those circumstances there would be a taking. Though it would be only an easement of flight which was taken, that easement, if permanent and not merely temporary, normally would be the equivalent of a fee interest. It would be a definite exercise of complete dominion and control over the surface of the land. The fact that the planes nèver touched the surface would be as irrelevant as the absence in this day of the feudal livery of seisin on the transfer of real estate. The owner's right to possess and exploit the land— that is to say, his beneficial ownership of it—would be destroyed. It would not be a case of incidental damages arising from a legalized nuisance such as was involved in *Richards v. Washington Terminal Co.,* 233 U.S. 546, 34 S.Ct. 654, 58 L.Ed. 1088, L.R.A. 1915A, 887. In that case property owners whose lands adjoined a railroad line were denied recovery for damages resulting from the noise, vibrations, smoke and the like, incidental to the operations of the trains. In the supposed case the line of flight is over the land. And the land is appropriated as directly and completely as if it were used for the runways themselves.

There is no material difference between the supposed case and the present one, except that here enjoyment and use of the land are not completely de-

4. Several accidents had occurred near Caus-

by's property but none had occurred on it.

stroyed. But that does not seem to us to be controlling. The path of glide for airplanes might reduce a valuable factory site to grazing land, an orchard to a vegetable patch, a residential section to a wheat field. Some value would remain. But the use of the airspace immediately above the land would limit the utility of the land and cause a diminution in its value." *Id.* at 261–62, 66 S.Ct. 1062 (footnotes omitted).

In holding that the flights over the land constituted a taking, the Court noted it is obvious that for a landowner to have full enjoyment of the land the landowner must have exclusive control of the immediate reaches of the enveloping atmosphere. *Id.* at 264, 66 S.Ct. 1062. Essentially, the holding boiled down to this—the landowner owns at least as much of the space above the ground as can be occupied or used in connection with the land, even if it is not occupied in the physical sense. *Id.*

That being said, the Court noted that its holding was limited to the situation where flights were so low so as to affect the use of the land. In discussing the limitations on its holding, the Court stated:

"The airplane is part of the modern environment of life, and the inconven-

iences which it causes are normally not compensable under the Fifth Amendment. The airspace, apart from the immediate reaches above the land, is part of the public domain. We need not determine at this time what those precise limits are. Flights over private land are not a taking, unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land. We need not speculate on that phase of the present case." *Id.* at 266, 66 S.Ct. 1062.

Since that decision was rendered, numerous courts have attempted to parse the language of *Causby* to determine whether property owners have been subject to a taking of property because of the effects of noise from aircraft flights. The results of those cases have varied widely. In *Aaron v. United States*, 160 Ct.Cl. 295, 311 F.2d 798 (1963), the United States Court of Federal Claims [5] was called upon to determine whether a claim may be maintained when flights which are alleged to have resulted in a taking are flying within the navigable airspace. The court discussed the regulation of the airspace and noted that the altitude at issue was 500 feet.[6]

**5.** The court was referred to as the Court of Claims at the time of the *Aaron* decision. Its name was subsequently changed to the United States Claims Court before becoming the Court of Federal Claims. Because we will discuss cases from the different eras of the court, we will refer to it as the Court of Federal Claims for reader clarity.

**6.** The regulation controlling altitude of flights, found at 14 C.F.R. § 91.119 (2005), states in relevant part:

"Except when necessary for takeoff or landing, no person may operate an aircraft below the following altitudes:
(a) *Anywhere.* An altitude allowing, if a power unit fails, an emergency landing without undue hazard to persons or property on the surface.

(b) *Over congested areas.* Over any congested area of a city, town, or settlement, or over any open air assembly of persons, an altitude of 1,000 feet above the highest obstacle within a horizontal radius of 2,000 feet of the aircraft.
(c) *Over other than congested areas.* An altitude of 500 feet above the surface, except over open water or sparsely populated areas. In those cases, the aircraft may not be operated closer than 500 feet to any person, vessel, vehicle, or structure."
In the case at bar, the flights clearly take place over a congested area, making 1,000 feet the altitude above the surface at which the navigable airspace begins.

A second issue is presented by the regulation. It is titled "Minimum safe altitudes: General." Even without this title, a quick reading of the regulation leads us to believe

Thus, the question became whether there could be a taking if aircraft flew over property at an altitude of more than 500 feet.

The court noted that the inconvenience and annoyance experienced from a flight at 501 feet above a person's property is hardly distinguishable from that experienced from the passage of a plane at 490 feet. *Id.* at 801. Nonetheless, the court concluded:

"the extent of a right-of-way, whether on the ground or on water or in air, has to be definitely fixed. Acts that are permissible within the limits of the right-of-way are forbidden beyond its limits, and vice versa. Congress has fixed 500 feet as the lower limit of navigable airspace; hence, what may be permissible above 500 feet is forbidden below it, unless compensation is paid therefor." *Id.*

But the court did not stop with a hard-and-fast rule that a taking could never occur for flights in the navigable airspace. Rather, it concluded that unavoidable damage could be so severe as to amount to a practical destruction or substantial impairment of the property. *Id.* The court concluded that the plaintiffs did not make such a showing; thus, only plaintiffs whose property was affected by flights below 500 feet were entitled to recovery. *Id.* at 801–02.

In *Stephens v. United States*, 11 Cl.Ct. 352 (1986), the Court of Federal Claims once again reviewed whether flights which occurred in the navigable airspace (1,000 feet in that case) could result in a taking. The court concluded that, as a general proposition, because the overflights occurred at more than 1,000 feet, there could

be no taking. *Id.* at 359. However, the court recognized that an exception could exist. *Id.* The court then crafted the following general rule:

"when overflights occur in navigable airspace, a presumption of non-taking exists which can be overcome by proof of destruction of, or substantial impairment to the property. As the height of overflights increases, however, the Government's interest in maintaining air sovereignty becomes weightier while the landowner's interest diminishes, so that the damage showing required increases in a continuum toward showing absolute destruction of all uses of the property." *Id.* at 362.

In *Thornburg v. Port of Portland*, 233 Or. 178, 376 P.2d 100 (1962), the Oregon Supreme Court reviewed a jury's denial of plaintiffs' claim of inverse condemnation resulting from flights which passed directly over the plaintiffs' land or near to it. The court structured the issue as whether a "noise-nuisance" could amount to a taking. *Id.* at 101. The court also noted that the parties agreed that a taking of property must be shown and not merely the suffering of some damages because of the wording of the eminent domain section of the Oregon Constitution.[7] *Id.* at 103.

In its analysis, the court opined that a nuisance may be such an invasion of the rights of a possessor as to amount to a taking any time a possessor is in fact ousted from enjoyment of his land. *Id.* at 105. The court also noted that it makes no difference to the disturbed landowner whether the flight would be at 499 feet or 501 feet above the property because it was possible that the person could be ousted

---

that it was written to protect landowners and individuals from crashes, not to prevent noise disturbances. Thus, it is questionable whether this regulation is relevant to the issue presented in this appeal.

7. The Oregon Supreme Court noted that the constitutions of several states allow recovery for property "taken or damaged." *Id.* at 104.

84

from the legitimate use of the property by an aircraft flying above 500 feet. *Id.* at 109. The court also noted that while it was desirable as an administrative device to craft a rule whereby flights above 500 feet could not result in a taking, such rule would not address the problem which property owners faced. *Id.* at 109–10. Rather, factual data relevant to the situation should be reviewed by a trier of fact to determine whether a reasonable landowner would be disturbed by the flights. *Id.* Importantly, the court also noted that for whatever reason a 500–foot floor under a cruising flight might have as a matter of public safety, the only reason it should be used as a rule of real property law is if factual data proves that flights above 500 feet do not disturb ordinary, reasonable people. *Id; see also* n. 5, *supra.*

In the case before us, IAA[8] argues that these cases, and others, stand for the proposition that flights in the navigable airspace cannot constitute a taking. We disagree. Even those cases which denied the claim of a taking because the flights were over 500 feet acknowledged that under some circumstances flights in the navigable airspace may create a nuisance resulting in a taking. We agree with the *Thornburg* court that the solution must address the problem. There can be no imaginary line above which flights cannot result in a taking and below which they may without some rational basis for the imposition of that boundary. It is conceivable that constant or even intermittent flights in the navigable airspace may interfere more in the use and enjoyment of property than the occasional flight below the navigable airspace. Landowners who feel that they are subject to a taking because of flights in the navigable airspace should have the opportunity to present their claims to a trier of fact and not have them dismissed because of an arbitrary rule which apparently was written with safety as its concern, not the legitimate and enjoyable use of property. Thus, the trial court erred in granting summary judgment upon the ground that flights in the navigable airspace could not result in a taking.[9]

Because we have concluded that a taking may occur because of flights in the navigable airspace, we must address the issue of whether Homeowners have alleged genuine issues of material fact for an inverse condemnation claim. In order to receive compensation in a condemnation action, a landowner must show that the injury suffered is special and peculiar to

8. From the Homeowners' brief, we deduce that they are not challenging the grant of summary judgment in favor of BAA on this particular claim. BAA asserts as much in its brief, and this assertion was not challenged by the Homeowners in their reply brief.

9. IAA argues that the federal cases which have held that flights in the navigable airspace may result in a taking require " 'practical destruction or substantial impairment.' " IAA's Appellee's Brief at 22 (citing *Argent v. United States,* 124 F.3d 1277, 1282–83 (Fed. Cir.1997)). IAA then argues that, as a matter of law, Homeowners have failed to carry that burden because the activities at the Airport are not peculiar and case law requires that the complained of activity be a peculiar air-

port operation or a military exercise. From a review of the record, we conclude that a genuine issue of material fact exists as to the level of the impairment of use of the property visited upon the Homeowners because of the flights and that the trier of fact should resolve whether the Homeowners should recover. A taking is a taking whether it be based upon peculiar activities or normal everyday operations. The level of harm is not necessarily distinguishable because the activities giving rise to the harm are normal, everyday operations rather than a peculiar activity. However, we recognize that in some cases, such as if flights occurred at 20,000 feet, we would likely hold that a taking could not occur as a matter of law.

the landowner's real estate and not some general inconvenience suffered by the public generally. *Young v. State*, 252 Ind. 131, 134, 246 N.E.2d 377, 379 (1969), *cert. denied* 396 U.S. 1038, 90 S.Ct. 685, 24 L.Ed.2d 683 (1970). A taking may occur because of substantial interference with private property which destroys or impairs the free use and enjoyment of the property or the rights and interests in the property. *State v. Stefaniak*, 250 Ind. 631, 637, 238 N.E.2d 451, 454 (1968). Whether a particular interference is substantial is a question of fact for the fact-finder. *Mendenhall v. City of Indianapolis*, 717 N.E.2d 1218, 1227 (Ind.Ct.App.1999), *trans. denied.*

■ IAA argues that the injury suffered by the Homeowners is not a special injury, but that thousands of others living in the vicinity of the Airport are subject to the same type of injury.[10] IAA points to the land use programs which it has developed to assist residents in the area who are affected by the noise of aircraft overflights. It notes that over 2,000 homeowners have participated in the noise mitigation procedures.

We interpret the IAA's argument as this: because so many—numbering in the thousands—are affected by the noise from aircraft overflights as aircraft leave or arrive at the Airport, the injury suffered by the Homeowners could not be special and peculiar. In some sense, this is a defensible position. However, the defensibility is lost when one logically considers the impact of such a holding. In essence, by conducting an activity in a densely populated area such as around housing develop-ments, the State could protect itself from a takings claim even though the same activity would be a taking if it were placed in a sparsely populated area and affected only one landowner. This can hardly be the result anticipated and desired when our Supreme Court stated in order for a taking to occur, the injury must be one not suffered by the public generally. Rather, the focus is upon the entire public in general. Do all residents of Indianapolis face the impairment of use of their property because of the overflights of aircraft utilizing the Airport? Clearly not. In fact, by IAA's own admission, the overflights affect thousands of homeowners, a tiny fraction of the hundreds of thousands that live in the greater Indianapolis area. Consequently, we conclude that the injury[11] suffered by the Homeowners is not suffered by the public generally but is special and peculiar to the Homeowners, who have chosen to file a claim against IAA, and others similarly situated who have not sought legal recourse. Because the Homeowners have alleged facts which present a genuine issue of material fact as to whether the interference with the use of their property is substantial, this issue is not one which should have been disposed of by summary judgment but should be resolved by the trier of fact.

II

*Fakeses' Inverse Condemnation Claim*

■ The Fakeses present an issue with respect to their individual inverse condemnation claim. The trial court concluded that language in the purchase agreement

10. The trial court also concluded that summary judgment was proper because several plaintiffs all complained of the same injury and numerous others in the vicinity of the Airport also likely were experiencing the same noise.

11. The Homeowners specifically claim that the noise has diminished the value of their property, caused sleep deprivation, and interrupted watching television, listening to the radio, talking on the telephone, and hosting outdoor dinners and parties.

and warranty deed through which the Fakeses took possession of their residence precluded a claim for inverse condemnation because the language acted as a contractual agreement by which the sellers of the residence were compensated and the Fakeses accepted the home with the noise and all other effects of the Airport. The Fakeses assert that the language contained in the purchase agreement and warranty deed was "at best, a promise not to hold the *sellers* liable for nondisclosure of the airport noise," but that even that proposition is questionable because it is framed solely as a disclosure and not a release or covenant. Appellant's Brief at 23. The Fakeses further argue that "the 'contract' is not 'expressed' so as to give the Fakes[es] reason to know that Defendants might claim that they were released, or that the seller wanted the Defendants to be released." *Id.* Thus, according to the Fakeses, the IAA cannot successfully claim the status of a third party beneficiary.[12]

We disagree with the Fakeses' proposition and conclude that they are precluded from maintaining an inverse condemnation claim against IAA for several reasons. The first is that the IAA was a third-party beneficiary of the agreement between the Fakeses and the sellers.

▆▆▆▆ One not a party to an agreement may nevertheless enforce it by dem-

onstrating that the parties intended to protect the non-party by the imposition of a duty in the non-party's favor. *Kirtley v. McClelland,* 562 N.E.2d 27, 37 (Ind.Ct. App.1990), *trans. denied.* For an obligation to be enforceable, it must clearly appear that it was the purpose or a purpose of the contract to impose an obligation on one of the contracting parties in favor of the third party. *Id.* It is not enough that performance of the contract would be of benefit to the third party. *Id.* It must appear that one of the parties intended to require performance of some part of the agreement in favor of the third party, and that the other party to the agreement intended to assume some duty imposed. *Id.* The intent of the parties should be gathered from the terms of the contract itself, considered in its entirety against the background of the circumstances known at the time of execution. *Id.*

After the Fakeses made their offer to purchase their home by submitting the "Purchase Agreement," the seller submitted an addendum to the Purchase Agreement. The addendum included the following provision:

" 'The Real Estate described herein is located in the Sales Assistance Program area as defined in the Indianapolis Airport Authority's Part 150 Noise Compa-

---

12. The IAA argues that the Fakeses had lived in Hawthorne Ridge since 1988 and had moved twice within the neighborhood, purchasing their current home in 1999. For support, it cites to the "Summary of Plaintiffs' Answers to Interrogatory No. 10." IAA Appendix at 43. The answer states, "We have both lived on the west side of Indianapolis all our lives. We built a house in Hawthorne Ridge in 1988 (7883 Austin Court) and the flight path was not a problem. We moved around the corner to Persimmon Pass in 1995 because we had no knowledge of a new runway. About a year later, the planes started flying over our house." *Id.* While the answer attributed to the Fakeses would indicate that they had lived in Hawthorne Ridge since 1988 and had moved once, we cannot attribute any weight to it. This is so because the identical answer was given for a separate family, the Adcocks, leading us to conclude that an error was made by whomever typed the joint responses. More importantly, other answers indicate that the Adcocks currently live on Persimmon Pass while the Fakeses live on Austin Court. Had the answer been made by the Fakeses, there is no reason to doubt that they would have included the move in 1999 to their current residence.

tibility Study Update dated October 9, 1998. The Sales Assistance Program is a voluntary Program and Sellers have elected to avail themselves of the Sales Assistance Program benefits and obligations pursuant to which seller may receive a payment from the Indianapolis Airport Authority subject to the terms of paragraph of the Participation Agreement Residential Sales Assistance Program of ten percent (10%) of the Contract Sales Price as specified in the Purchase Agreement or Closing Statement, whichever is less, in exchange for the placement of a Noise Disclosure Statement in the Deed of Conveyance and such other documents transferring an ownership or fee interest in the Real Estate to Purchaser.' " IAA App. at 123.

The addendum was agreed to by the Fakeses. The Warranty Deed also included a provision discussing the noise from the Airport and stated that the Fakeses were purchasing the real estate with full knowledge and acceptance of the noise.

 While the Fakeses are correct in asserting that the agreement here does not specifically state that it was written for the protection of the IAA from claims arising out of complaints about the noise, it is clear that the above quoted provision was included to place the Fakeses on notice about the noise. More importantly, one need not perform any mental gymnastics to deduce that the provision was included to protect the IAA from claims arising from noise. The provision specifically stated that the IAA had compensated the sellers in exchange for them providing the notice to the Fakeses. If the provision were not intended to induce the Fakeses agreement to refrain from filing claims against the IAA because of noise from the operation of the Airport, there would be no reason for the seller to notify the Fakeses that the IAA had provided compensation in exchange for the notice. Thus, we conclude that the intent of the agreement was that the Fakeses would not seek compensation from the IAA because of the noise disturbances from the operation of the Airport. Consequently, the trial court appropriately dismissed the Fakeses claim for inverse condemnation.[13]

## III

### Promissory Estoppel

 In the summary judgment proceedings, the Homeowners asserted that they have a cause of action based upon the theory of promissory estoppel. Specifically, they assert that the IAA promised that it would not " 'break up a neighborhood' " and would " 'treat neighbors alike.' " App. at 205. The Homeowners believe that in making this promise, the IAA was indicat-

---

**13.** A further ground supports this resolution of the issue. If a taking has indeed occurred, the landowner at the time of the taking, and not subsequent landowners, is entitled to the payment for impairment of the property because there is no "ongoing" taking. *U.S. v. Dow,* 357 U.S. 17, 20–21, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958); *Continental Enters. Inc. v. Cain,* 180 Ind.App. 106, 114–15, 387 N.E.2d 86, 92 (1979). In other words, once the taking has occurred, the government then has an easement to conduct its activities. Only if the scope of the activities would significantly change could the landowner possibly be entitled to compensation for a further taking.

The facts here indicate that the impairment to the property began prior to the Fakeses' purchase of the home. Consequently, if a taking did occur, the sellers of the home had received compensation for it. However, it may well be that the trier of fact determines that no taking occurred. In that case, the payments by the IAA could be seen as a gratuitous payment for community relations purposes to compensate landowners for the disturbances to their use of the property.

ing that all residents would be treated like their neighbors in receiving compensation or assistance with the noise problems. As a result, they saw no need to join previous litigation with respect to the noise disturbances caused by overflights.

Indiana courts have generally viewed the doctrine of promissory estoppel as having five elements: (1) a promise by the promisor; (2) made with the expectation that the promisee will rely thereon; (3) which induces reasonable reliance by the promisee; (4) of a definite and substantial nature; and (5) injustice can be avoided only by enforcement of the promise. *Meisenhelder v. Zipp Exp., Inc.*, 788 N.E.2d 924, 932 (Ind.Ct.App.2003). A promisor who induces a substantial change of position by the promisee in reliance upon the promise is estopped from denying the enforceability of the promise. *Id.*

The parties focus their argument on the discussion of promissory estoppel by our Supreme Court in *Jarboe v. Landmark Cmty Newspapers of Indiana, Inc.*, 644 N.E.2d 118, 121 (Ind.1994). The Court stated:

> " 'A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by the enforcement of the promise. The remedy for breach may be limited as justice requires.' " *Id.* (quoting the Restatement (2nd) of Contracts § 90(1) (1981)).

The parties dispute whether Indiana law has been extended to include the provision allowing third parties to claim reliance upon the promise by the promisor. We do not address that question. Rather, we focus our attention on an alternate theory advanced by the Homeowners, that a third party issue is not present and that the promise [14] was made to the entire neighborhood, including the residents who were not present at the meetings when the promise was made.

Our review of a considerable amount of case law has not revealed any case which lends much persuasive support, one way or the other, to the resolution of this issue. The IAA cites to *Doe v. General American Life Ins. Co.*, 815 F.Supp. 1281 (E.D.Mo. 1993). In that case, an insurer had originally paid for the plaintiff's substance abuse treatment because it believed that she was seeking treatment for alcohol addiction. Upon learning that the plaintiff was being treated for cocaine addiction, the insurer denied the claim and sought reimbursement for the treatment. The plaintiff argued that under the doctrine of promissory estoppel, the insurer should be required to pay for her treatment.

The facts reveal that the plaintiff did not consult with the insurer about the coverage. Rather, she was informed by hospital personnel and an unnamed individual from the local union through which her insurance was provided that her treatment would be covered. In holding that the plaintiff would receive no relief under the doctrine of promissory estoppel, the court noted that her evidence consisted of hearsay evidence regarding statements allegedly made to hospital personnel by a representative of the insurance company and a

---

14. This decision is not meant to address the merits of any issue with respect to the promissory estoppel claim because genuine issues of material fact exist with respect to whether a promise was made and what the promise meant. We only discuss the statement as a "promise" for the purpose of establishing that the Homeowners could rely upon the statement even though they were not present at the meetings when the statement was made. It may well be that a trier of fact could conclude that no promise was made for purpose of establishing a promissory estoppel claim.

statement allegedly made by a local union representative. *Id.* at 1286. Moreover, plaintiff did not offer any evidence that a representative of the insurer personally and directly stated to her that treatment for cocaine addiction was covered. *Id.* She offered no evidence that anyone connected with the insurer made any statement to her which could reasonably be interpreted as representing that coverage was provided for her treatment. *Id.* Finally, there was no evidence that plaintiff obtained treatment based upon the belief that her treatment was covered by the policy. *Id.*

As the IAA claims, the *General American* court did rely upon the fact that no representative of the insurer directly told the plaintiff that her treatment would be covered. One could rely upon this to support the proposition that the promise must be made directly to the individual who is claiming reliance upon the promise. However, it is possible that facts not contained in the opinion also contributed to the holding. One such consideration is the common statement by insurers that precertification procedures do not guarantee that a claim will be paid. Whether that existed here is unclear. In any event, to the extent *General American* can be read to require that the promise be made directly and personally to the individual who relies upon it, we decline to follow it under the facts present before us.[15]

The IAA does not dispute that it stated that it would not "break up a neighborhood" or something to that effect. By making a statement at a public meeting wherein it was discussing how it would address noise issues in various communities, the promise must be construed as being directed to each resident in an entire neighborhood. Otherwise, the promise would have little or no value. In fact, it is difficult to imagine that the IAA could believe that not all residents would be made aware of the statement because of the import of the situation. There can be no doubt that the promise, to the extent one was being made, was made to appease the minds of all residents, not just those who were in attendance at the meeting.

 BAA asserts further grounds as justification for summary judgment in its favor, including that it never made a promise and has no authority to make such a promise. With respect to the assertion that it never made a promise, BAA argues that the alleged promise was nothing more than a statement of intention or prediction, not a promise to do something. It asserts that the IAA was just stating its policy goals and was publicly announcing them. It is true that predictions, opinions, and prophecies do not constitute a promise. *Medtech Corp. v. Indiana Ins. Co.,* 555 N.E.2d 844, 847 (Ind.Ct.App.1990), *trans. denied.* However, we are unable to say as a matter of law that the statement was of an intention or prediction by the IAA. Rather, a genuine issue of material fact exists with respect to the meaning of the statement and whether the Homeowners reasonably relied upon it.

BAA also argues that it never made a promise because the only allegation against it was that one of its representatives repeated the promise made by the IAA. BAA argues that if it is liable for repeating the promise, then any individual or newspaper that ever repeated the promise would also be liable, which is an absurd result. We agree that an absurd result would be reached if any party who repeated the promise could be liable. Nonetheless, there could be some instances in which those who repeat the promise are

---

**15.** We note that the *General American* court also held that there was no evidence of reli-

ance, which supports the denial of a claim under the doctrine of promissory estoppel.

properly subject to liability. It is unclear what the role of BAA is in the process of compensating landowners for noise disturbances. Be that as it may, it is clear that BAA does take some active role in assisting the IAA. This in turn leads us to BAA's final argument, whether it has the power to make such a promise.

 BAA asserts that because the IAA must make land purchases according to the management contract between IAA and BAA, BAA could not have made such a promise. In support of this point, BAA relies upon *Garwood Packaging, Inc. v. Allen & Co., Inc.*, 378 F.3d 698 (7th Cir. 2004), *reh'g and reh'g en banc denied.* In that case, in discussing the vagueness of alleged promises and concluding that the more vague the alleged promise the less likely it will be found to be a promise, the court noted that a really vague " 'promise' would have been in the nature of a hope or possibly a prediction rather than a commitment to do something within the 'promisor's' power to do." *Id.* at 703–04. In interpreting this quotation, BAA deduces that one must have the power to follow through on the promise in order for the promise to be enforceable. Thus, because BAA did not have authority to purchase land, it did not have the power to follow through on the repeated promise. Our view of this statement is slightly different.

In reading *Garwood,* it is evident that the power to do something is the apparent ability to deliver upon the promise. The *Garwood* court used as an example of a promise that could not be delivered upon the statement " 'I promise it will rain tomorrow.' " *Id.* at 704. The "promise" at issue in *Garwood* was that the agent would see the deal through " 'come hell or high water.' " *Id.* at 701. The court concluded that the promisee could not literally believe that the "deal would go through 'come hell or high water,' since if Satan or a tsunami obliterated Ohio that would kill the deal." *Id.* at 704. Even if the agent had been able to secure performance by the company he worked for, the deal still may not have gone through because of the demands of other investors and the creditors' refusal to give releases until paid in full. *Id.* These were all problems of which the plaintiff was aware, and such precluded a reasonable understanding that the statement was a promise rather than an expression of optimism and determination. *Id.*

It is unclear if the Homeowners had any actual knowledge of the powers of BAA. What is evident though is that BAA participated in the meetings with the IAA and may have given the appearance that it had some authority with respect to compensating residents for the noise disturbances. Thus, a reasonable individual may have believed that BAA had the power to deliver upon the promise. But given that the case is before us on review of a grant of summary judgment and genuine issues of material fact exist with respect to what the Homeowners actually believed the promise meant and what beliefs they had about BAA's ability to follow through upon it, we are unable to make a conclusion as a matter of law.

Summary judgment is affirmed with respect to the Fakeses' claim for inverse condemnation. However, the grant of summary judgment is reversed upon the ground that a flight over 1,000 feet could not constitute a taking. The grant of summary judgment is also reversed with respect to the promissory estoppel claim because if a promise was made, it was necessarily directed to the Homeowners. Consequently, we remand to the trial court for further proceedings not inconsistent with this decision.

Affirmed in part, reversed in part, and remanded.

NAJAM, J., and RILEY, J., concur.