In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-2718

LARRY BOWERS, ALAN G. SYMONS,
CAREY JOHNSON, et al.,

*Plaintiffs-Appellants,*

*v.*

FÉDÉRATION INTERNATIONALE DE L'AUTOMOBILE,
FORUMLA ONE ADMINISTRATION LIMITED,
INDIANAPOLIS MOTOR SPEEDWAY CORPORATION, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:05-cv-00914-SEB-VSS—**Sarah Evans Barker**, *Judge.*

ARGUED DECEMBER 4, 2006—DECIDED MAY 25, 2007

Before EASTERBROOK, *Chief Judge,* and CUDAHY and
SYKES, *Circuit Judges.*

CUDAHY, *Circuit Judge.* The defendants organized a
car race. Although twenty cars were originally scheduled
to race, fourteen of the twenty did not participate after
it was discovered that a flaw in their tires rendered
them dangerous for use at full speed on one part of the
track. Disappointed fans sued, seeking their expenses
in attending and viewing the race. The district court
dismissed the complaint for failure to state a claim on

which relief can be granted. The plaintiffs appeal; we affirm.

## I. Background

The Fédération Internationale de l'Automobile (FIA) is an international body that governs certain types of automobile racing. The most famous is Formula One, which uses single-seat cars specially designed for high-speed racing. The sport has traditionally been popular in Europe, but Formula One races (often referred to as "grand prix" races) have been held elsewhere in an effort to spread their popularity. One such race, the 2005 United States Grand Prix (2005 USGP or "the race"), was scheduled to be run at the Indianapolis Motor Speedway (IMS) in Speedway, Indiana, on June 17 through 19, 2005. Grand prix races are multi-day events, with two days of practice driving and qualifying laps that determine the position of the cars at the start of the race, followed by the race itself on the final day. Twenty drivers–ten teams of two, each representing a different auto manufacturer–were scheduled to roll.

On June 17, during the first day of practice driving, driver Ralf Schumacher crashed when his left rear tire blew out on turn thirteen of the IMS track, a high-speed banked turn, apparently unusual among Formula One race courses. Sport reporters began to see a disturbing pattern: Schumacher used tires manufactured by Michelin ETC, and another driver using Michelin tires had suffered a blow-out and crashed on that same turn the previous year. The next day, Michelin sent a letter to the FIA's Race Director and Safety Delegate at IMS stating that it had warned its teams that it might not be safe to use its tires "unless the vehicle speed in turn 13 can be reduced." Michelin acknowledged that it was too late to get different tires to the track for qualifying laps and that

the rules required cars to race on the same sort of tires used to qualify. Since fourteen of the twenty cars scheduled to race used Michelin tires, this was a significant problem.

The FIA shot back a letter dated June 19, the day of the race, refusing to level the playing field (or, more precisely, the race track) between cars using the questionable Michelin tires and solid Bridgestone tires. It would alter neither the rules (for instance, by permitting racers to use different tires than those used to qualify) nor the course (for instance, by adding a chicane ahead of turn thirteen to force the Bridgestone teams to reduce their speed prior to the turn as well). It was the Michelin teams' own fault they hadn't brought suitable equipment to the track. They had basically two options: race on different tires and accept a penalty, or take turn thirteen slower than the Bridgestone teams and hope to make up time on the rest of the track.

The plaintiffs' complaint claims that in the hours leading up to race time, Michelin and its teams threatened not to participate unless changes were made to help them. Allegedly "[s]everal proposals were discussed . . . but no agreement was reached as to a solution because the FIA and [the] Ferrari" team, the latter armed with Bridgestone tires and pressing its advantage, "refused to agree to any solutions acceptable to the other teams."[1] The plaintiffs claim that the racing teams, the FIA, Michelin and IMS finally agreed that all the teams would participate in a

---

[1] The plaintiffs' brief claims that the parties used the tire problem "to promote their own ends in an internecine struggle over Formula One revenue." (Br. of Appellants at 16.) We are not sure what the plaintiffs mean and they do not explain further; they may be referring to the winner's purse. At any rate, this consideration is irrelevant to our resolution of the case.

low-speed "formation lap" (also known as a "parade lap") that takes place prior to the start of racing proper, but that afterwards the Michelin teams would exit from the track, leaving only the Bridgestone teams to drive the race.

That is precisely what happened. Everyone was furious. Representatives of the FIA, Michelin, IMS and the racing teams rained accusations and recriminations upon one another, calling the race a "farce" and saying that the fans had been cheated. The racing crowd dubbed the affair "Indygate."

Several fans who attended the 2005 USGP separately filed purported class actions against the FIA and some related organizations governing Formula One racing, IMS, the racing teams and Michelin. They alleged that the defendants owed them the price of their tickets and the cost of travel and other expenses they had incurred in attending the race (only the latter is now relevant, since Michelin has been permitted to give the fans a full refund of the ticket price). The cases were consolidated in the Southern District of Indiana, where the district court, without certifying a class, dismissed the plaintiffs' third amended complaint for failure to state a claim. The plaintiffs now appeal.

## II. Discussion

We review a dismissal for failure to state a claim *de novo*. *Moranski v. Gen. Motors Corp.*, 433 F.3d 537, 539 (7th Cir. 2005). A plaintiff's complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The statement must give "fair notice of the claims against [the defendant] and a reasonable opportunity to form an answer." *Pratt v. Tarr*, 464 F.3d 730, 732 (7th Cir. 2006). Dismissal is appropriate if a plaintiff does not allege

such a claim or if it appears beyond doubt that the plaintiff can prove no set of facts that would entitle her to relief. *Edwards v. Snyder*, 478 F.3d 827, 830 (7th Cir. 2007).

The plaintiffs seek to recover from the various defendants under several different theories: breach of contract (and tortious interference with the same), promissory estoppel and negligence. We discuss each theory in turn.

A.  Breach of the Ticket Contract

The plaintiffs allege first that IMS (and, somehow, the other defendants) breached a contractual obligation to the race attendees when only six cars drove. Whenever it sold a ticket to the 2005 USGP, the plaintiffs claim, IMS (and somehow the other defendants) "promised a regulation Formula One Racing League race" in exchange for the ticket price. The plaintiffs then claim that in light of the rules governing Formula One racing, a grand prix has to have at least twelve cars in it. Only six cars participated here, breaching the contract.

This claim arguably should fail because IMS promised only to admit the plaintiffs to the race grounds on the days of the grand prix. While we are unaware of any Indiana case addressing the nature of a contract formed by the sale of an admission ticket, *cf. Skalbania v. Simmons*, 443 N.E.2d 352 (Ind. Ct. App. 1982) (addressing a class certification question in a beach of contract action by season ticket holders against a hockey franchise, but explicitly reserving the merits), most states agree that the seller contracts only to admit the plaintiff to its property at a given time. The plaintiff buys the ticket, of course, in order to see an event that is scheduled to occur on the ticket-seller's grounds, but the seller does not contract to provide the spectacle, only to license the plaintiff to enter and "view whatever event transpire[s]." *Castillo v.*

*Tyson*, 701 N.Y.S.2d 423, 423 (N.Y. App. Div. 2003); *see also Petrich v. MCY Music World, Inc.*, 862 N.E.2d 1171, 1180 (Ill. App. Ct. 2007); *Yarde Metals, Inc. v. New England Patriots Ltd. P'ship*, 834 N.E.2d 1233, 1236 (Mass. App. Ct. 2005); *Sweeny v. United Artists Theater Circuit, Inc.*, 119 P.3d 538, 540-41 (Colo. Ct. App. 2005); *Six Flags Theme Parks, Inc. v. Dir. of Revenue,* 102 S.W.3d 526, 533 (Mo. 2003); *Wichita State Univ. Intercollegiate Athletic Ass'n v. Marrs*, 28 P.3d 401, 403 (Kan. Ct. App. 2001). *But see Miami Dolphins, Ltd. v. Genden & Bach, P.A.*, 545 So.2d 294, 296 (Fla. Dist. Ct. App. 1989) (holding that a provision of a season ticket agreement requiring a refund when games were cancelled due to labor strikes was triggered when a football team played a game using strikebreakers).

The plaintiffs provide us no reason not to construe their tickets this way. While one *could* contract to provide a spectacle, one wonders why an exhibitor like IMS would do so, given that it has control over its grounds but not over the performers and their scheduled performances. Further, a spectator could reasonably decide to do without a contractual right to the spectacle itself, trusting that the exhibitor will work with the performers to ensure that the spectacle goes off lest both develop a bad reputation that could damage their future business. In the present case, Formula One is struggling to take root in the United States, where the racing of stock cars (modified versions of cars designed for the general public, governed by NASCAR) is the preeminent automotive sport. "Indygate's" potential damage to Formula One's American reputation was a serious concern for everyone involved; some speculated at the time that the FIA might never hold a race at IMS again.

Nonetheless, because we are sitting in diversity, "conservatism is in order" in construing Indiana law, *Lexington*

*Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1092-93
(7th Cir. 1999), so we rest our decision on a narrower
ground. Even assuming, as the plaintiffs claim, that
they had a contractual right to a regulation Formula One
race (and further assuming a right to have the race
stewards properly interpret the applicable regulations on
the spot), they got such a race here. The plaintiffs claim
that certain provisions of the 2005 Formula One Sport-
ing Regulations (F1 Regulations)[2] operate poorly with
fewer than eleven racers—the first eight finishers get
points towards the annual championship, F1 Regulations
¶ 21, and certain infractions may be penalized, in among
other ways, by moving the offending car ten slots back
in the starting grid, F1 Regulations ¶ 54(c). But while a
six-car race under the Regulations may be less rich,
interesting or challenging than a twelve-car race, it is
not prohibited or nonsensical under the rules (like a
soccer match between three teams or a basketball team
getting a first down). These rules cannot be interpreted
to impose a "minimum car" requirement. There is no
reason to claim, as the plaintiffs in all seriousness do, that
no race occurred.

Additionally, the regulations explicitly permit any
race for which fewer than twelve cars are available to
be cancelled. Any league sport must address common
complications that can prevent a contest from properly
occurring, including the non-appearance of contestants.
In baseball, for instance, a team that fails to field nine

---

[2] The plaintiffs did not attach the F1 Regulations to their
complaint, but the regulations were central to its allegations
(it stated that the "tickets . . . necessarily incorporated the
FIA regulations"), and the Regulations were subsequently of-
fered into the record. The parties do not dispute their written
content and agree that they should be considered on a motion to
dismiss.

players (unthinkable, the plaintiffs suggest) forfeits the game. Official Baseball Rules § 4.17, *available at* http://www.baseball-almanac.com/rule4.shtml. In Formula One racing, when fewer than twelve cars are available for a race, officials may cancel it—no one gets points towards the annual championship, even if they show up ready to go. F1 Regulations ¶ 17. We are reluctant to conclude that a six-car contest deprived the plaintiffs of a Formula One race when, given the way the FIA has chosen to address no-shows in its sport, the race could properly have been cancelled and the plaintiffs quite legitimately deprived of any race whatsoever. *See Castillo*, 701 N.Y.S.2d at 423 (holding that the fight in which Mike Tyson was disqualified for biting Evander Holyfield's ear was nonetheless a regulation boxing match).

The plaintiffs urge that even if the race could have been cancelled, the defendants were contractually required to use "reasonable efforts" not to cancel it, and that all the teams should have tried harder to put on a good race. But while every competitive sport is built around the presumption that the players will try hard to win, a contest is not invalidated by a player's poor effort. A team cannot claim that a loss does not count because one of its members was dogging it. And once it is established that the plaintiffs received a regulation race, they admit that they had no additional right to a race that was *exciting* or drivers that competed *well. See, e.g.*, *Beder v. Cleveland Browns, Inc.*, 717 N.E.2d 716, 720-21 (Ohio Ct. App. 1994); *see also Seko Air Freight, Inc. v. Transworld Sys., Inc.*, 22 F.3d 773, 774 (7th Cir. 1994) ("That the Chicago Cubs turn out to be the doormat of the National League would not entitle the ticketholder to a refund.").

While the plaintiffs were upset (and perhaps justifiably so if the complaint's allegations are true) at the Bridgestone teams for putting their desire to win ahead of a taste for even competition, or at the Michelin teams

for deciding to take their ball and go home rather than do the best they could, the plaintiffs had no contractual right to a different performance. The dismissal of their claim for breach of the ticket contract must be affirmed, and with it the dismissal of their claim that some defendants tortiously induced others to breach the contract.

B. Breach of Other Contracts

The plaintiffs also claim that the defendants breached other contracts among themselves "which impact the duty of each of the Defendants to present the 2005 USGP as represented," and of which the plaintiffs were third party beneficiaries to the extent that the contracts are "meant to control and determine: (i) the proper operation of the Race; (ii) [the] application of the rules of Defendants and the International Sporting Code; and (iii) the obligations of Michelin to provide safe and suitable tires for the Formula One automobiles entered in this Race." As already noted, the complaint does not allege a violation of the rules, and the plaintiffs have not argued the possibility of a tire obligation in this court; their argument has focused on portions of two contracts submitted in the record—the Concorde Agreement and the FIA Commercial Agreement. The plaintiffs claim that further discovery will reveal that these Agreements give them the right to have the defendants use their best efforts to ensure that at least sixteen cars race in every Formula One event.[3] It is almost unthinkable that the defendants granted fans of their sport the legal right to interfere

---

[3] Again, neither party objects to the consideration of these contracts on the motion to dismiss. The contracts were under seal in the district court and the plaintiffs filed copies of their initial brief and appendix under seal, but the contracts are now public because neither party moved to reseal the record in this court. *See* Seventh Circuit Operating Procedure 10(a).

with their private business relations, though the story is not farfetched enough to make a Rule 12(b)(6) dismissal appropriate on that ground. *See Loubser v. Thacker*, 440 F.3d 439, 441 (7th Cir.), *cert. denied*, 126 S. Ct. 2944 (2006). It is clear from the language of the contracts, however, that the three provisions upon which the plaintiffs rely do not grant them any such right.

One provision, Concorde Agreement § 5.3.1, imposes a duty upon all teams to "use their best endeavours to procure together that additional cars are entered into" any race into which fewer than twenty cars have been entered. But even assuming that "entry" means actually racing rather than registering to race, the plaintiffs could not have held rights under the provision as third party beneficiaries. Under Indiana law,[4] a contract grants a non-party rights only if an intent to grant the rights "affirmatively appear[s] from the language of the instrument when properly interpreted and construed." *Cain v. Griffin*, 849 N.E.2d 507, 514 (Ind. 2006). The plaintiffs argue that extrinsic evidence can be helpful to that interpretation and construction, but that is true only insofar as the "background of the circumstances known at the time of execution" reveals the meaning of the "terms of the contract itself." *Biddle v. BAA Indianapolis, LLC*, 830 N.E.2d 76, 86 (Ind. Ct. App. 2005), *aff'd in relevant part,* 860 N.E.2d 570 (Ind. 2007). In the present case, section 5.3.1 explicitly enumerates the parties that hold rights: the "Signatory Teams jointly undertake *to the FIA and to the Commer-*

---

[4] Although these contracts are between entities based outside the United States and govern races that are mostly run in Europe, the parties agree that Indiana law applies. *See Schlumberger Tech. Corp. v. Blaker*, 859 F.2d 512, 514 (7th Cir. 1988) (holding that the parties' silence forfeits choice-of-law issues).

*cial Rights Holder*" to provide twenty cars per race (emphasis added); the fans are not among those listed.

The plaintiffs also point to two other provisions in which all parties agree to try to ensure that at least sixteen drivers participate in the annual Formula One Championship—the racing league, not an individual race—and grant the FIA the power to alter the car-design limitations to let cars that would otherwise not meet Formula One requirements participate. These duties and powers do not relate to individual races. (It would be strange if they did, given that Concorde Agreement § 5.3.1 already requires efforts to secure *twenty* rather than sixteen cars; one of the two provisions, Concorde Agreement § 10.4, explicitly says it is "[w]ithout prejudice to Clause 5.3.") Consequently, the contracts were not violated in this case, and dismissal of the plaintiffs' claims as third-party beneficiaries of these contracts must be affirmed.

### C. Promissory Estoppel

Next, the plaintiffs claim that promissory estoppel binds the defendants to pay them their expenses in traveling to see the 2005 USGP. They allege that the defendants "conspired and acted together to provide advertising and promotion" that indicated ten teams and twenty cars would drive in the race, and that they did so with the expectation that the plaintiffs would rely on the representations. The plaintiffs relied; fewer than twenty cars drove; they want damages.

This claim must fail because no reasonable promoter or racing fan would have regarded a race's "advertising and promotion" concerning the number of cars scheduled to roll as a promise upon which someone could reasonably rely. Under Indiana law, a person will be estopped to deny

a duty to fulfill a promise only where the promise was made with the expectation that it would induce, and it does induce, reasonable reliance by the plaintiff. *Brown v. Branch*, 758 N.E.2d 48, 51 (Ind. 2001). Whether a statement could reasonably be taken as a reliable promise "depend[s] on the knowledge that the promisee brings to the table." *Garwood Packaging, Inc. v. Allen & Co.*, 378 F.3d 698, 704 (7th Cir. 2004) (applying Indiana law). If a plaintiff, given her background and knowledge, should have known that an event was doubtful and might not occur, then it was not reasonable for her to rely on a defendant's "promise" that it would. *Id.* at 704 (holding that a former investment banker's reliance on a business-man's promise that a deal to save a failing company would go through "come hell or high water" was unreasonable); *see also Sees v. Bank One, Ind., N.A.*, 839 N.E.2d 154, 164 (Ind. 2005) (holding that an attorney's reliance on a bank officer's statement that a guaranty was unenforceable was unreasonable).

In the present case, sports fans had to understand that numerous events could prevent a full complement of twenty cars from racing at a particular location on a particular day—dangerous track conditions, a driver's sudden illness, an accident in shipping a car to the track, any number of things, including the possibility that, for some reason, a driver might refuse to race. If the plaintiffs indeed went to Indianapolis only because they took the defendants' advertising as a reliable promise that twenty drivers, no fewer, would compete, they acted unreasonably.

The plaintiffs claim that this conclusion is inappropriate on a motion to dismiss, arguing that the reasonableness of a promise is a question of fact, *Garwood Packaging,* 378 F.3d at 705, and that their complaint does not specify the nature of the defendants' promises. But that is not true; the plaintiffs assert that the "promises" were adver-

tisements for the race and other promotional materials. The plaintiffs cannot seriously contend they were so naive as to take an advertisement for a twenty-car race as a reliable promise that twenty cars would roll. The dismissal of the promissory estoppel claim must be affirmed.

### D. Negligence

Finally, the complaint alleges that the non-IMS defendants "assumed a duty to Plaintiffs to present the Race as advertised and promoted." The defendants had no duty to provide a race to anyone, however, except insofar as they took on a contractual obligation to provide one. *See INS Investigations Bureau, Inc. v. Lee*, 784 N.E.2d 566, 576 (Ind. Ct. App. 2003).

In their briefs, the plaintiffs wisely abandon that theory but argue instead that because the defendants attempted to solve their disagreements concerning the race (the language the plaintiffs use, taken from an FIA press release, is that the defendants and in particular Michelin undertook to "impose a solution" to the disagreement), they were required to make the attempt with reasonable care. Their attempt was negligent and led to the impasse, damaging the plaintiffs. This claim is difficult to understand. Indiana sometimes imposes a duty of care on a defendant who voluntarily undertakes to perform a task for a plaintiff, but only where the plaintiff relies to its detriment on the defendant's help (by failing to perform the task itself, for instance), or where the defendant otherwise leaves the plaintiff worse off than if the defendant had done nothing. *City of Muncie ex rel. Muncie Fire Dep't v. Weidner*, 831 N.E.2d 206, 212 (Ind. Ct. App. 2005); *Rose v. Sewell*, 128 F.3d 1098, 1104 (7th Cir. 1997) (applying Indiana law). Here it is unclear how the plaintiffs relied to their detriment on the defendants' help, since no one but the defendants even knew of the disagreement

before race time and it is doubtful what an outsider could have done to resolve the situation if it had known. The plaintiffs would have been no worse off if the defendants threw up their hands as soon as the tire problem surfaced.

Even if the negligence claim made sense, Indiana's economic loss doctrine would still bar damages in tort for a product or service that fails to perform properly. *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 153-54 (Ind. 2005); *see also id.* at 151 (holding that the doctrine applies "whether or not the product or service is supplied in a transaction subject to" the Uniform Commercial Code). Because the plaintiffs seek to recover for a service (the race) that was not up to snuff, the doctrine bars their recovery. Dismissal of the plaintiffs' final claim was appropriate.

## III. Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*